JON J. PRAGER AND NANCY M. PRAGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Prager v. Commissioner
Docket No. 9596-91
United States Tax Court
T.C. Memo 1993-452; 1993 Tax Ct. Memo LEXIS 459; 66 T.C.M. (CCH) 855; September 28, 1993, Filed *459 Decision will be entered under Rule 155. For petitioners: [1]Roger A. Pies, Henry G. Zapruder, David J. Fischer, and Joanne M. Fay. For respondent: Karen E. Chandler. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies, additions to tax, and additional interest with respect to petitioners' Federal income taxes as follows: Year
Deficiency
Additions to Tax and Additional Interest
Sec. Sec.
Sec.
Sec.
[1] 6653(a)(1) 6653(a)(2)
6661
6621(c)
1980
$ 259,215
$ 12,961
--
--
[3]
1981
220,584
11,029
[2]
--
[3]
1982
229,785
11,489
[2]
$ 57,446
[3]
1983
101,252
5,063
[2]
25,313
[3]
1984
84,001
4,200
[2]
21,000
[3]
The primary issues in this case involve positions *460 taken by petitioners [2] on their joint Federal income tax returns with respect to a series of purchase and leaseback transactions entered into by petitioner Jon J. Prager either individually or through different partnerships. Some concessions have been made by petitioners. The following issues remain for decision: (1) Whether petitioners erroneously deducted losses related to petitioner's individual purchase and leaseback transactions; (2) whether petitioners erroneously deducted losses related to petitioner's partnership purchase and leaseback transactions; (3) whether petitioners erroneously deducted investment interest expenses related to promissory notes executed in connection with both petitioner's individual and partnership purchase and leaseback transactions; (4) whether petitioners' investment tax credits for 1981 and 1982 are properly limited to $ 401 and $ 105, respectively; (5) whether petitioners are liable for the additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a) [3] for 1980, and section 6653(a)(1) and (2) for 1981, 1982, 1983, and 1984; (6) whether petitioners are liable for the additions to tax for substantial *461 understatement of income tax liability under section 6661 for 1982, 1983, and 1984; and (7) whether petitioners are liable for additional interest under section 6621(c) for 1980, 1981, 1982, 1983, and 1984. FINDINGS OF FACT I. INTRODUCTION
Some of the facts have been stipulated, and they are found accordingly. A. Petitioners
Petitioners Jon J. and Nancy M. Prager resided in Potomac, Maryland, at the time they filed their petition in this case. They timely filed joint Federal income tax returns for 1980, 1981, 1982, 1983, and 1984. They filed an amended Federal income tax return for 1984 on February 9, 1987. Petitioner has several degrees in business administration. *462 In 1961 he received a bachelor of arts degree in business administration with a major in finance and minors in accounting, economics, and marketing from the University of Miami. In 1964 petitioner received a master of business administration degree with a major in personnel and a minor in bank administration from New York University. Finally, in 1966, he received a doctorate in business administration from Indiana University's Graduate School of Business with a major in finance with associated fields in accounting, personnel, economics and money, and banking. Petitioner is also a certified public accountant. After receiving his doctorate, petitioner worked in the treasurer's department of Standard Oil Co. of New Jersey for approximately 2 years. He then became manager of finance at Eastern Airlines. B. Finalco Group, Inc.
In 1968 petitioner cofounded Finalco Group, Inc. (hereinafter FG), [4] *463 a corporation that structured equipment sale and leasing [5] transactions. FG's principal offices were located in McLean, Virginia, during the years in issue. FG became a publicly traded company in August 1983. The following table reflects the percentage of shares owned by FG's major shareholders before and after the 1983 public offering: Before Offering
After Offering
Petitioner
38.3%
34.2%
Stephen C. Eastham (Eastham)
24.6%
21.0%
Lee B. Burnett (Burnett)
25.6%
22.0%
JFO, Ltd.
11.0%
5.6%
JFO, Ltd., was owned by John F. Olmstead (Olmstead), his wife, and trusts established by Olmstead. Petitioner held a variety of positions with FG: Vice president and treasurer from 1968 to June 1978; chief financial officer from June 1978 until *464 October 1981; and, until June 1983, senior executive vice president. In anticipation of FG stock being sold to the public, petitioner became FG's chairman of the board and chief executive officer in June 1983. As of August 1983, the directors and executive officers of FG were as follows: petitioner -- chairman of the board, chief executive officer and director; Eastham - president and director; Burnett - executive vice president and director; Charles Duggan - vice president-finance, treasurer, and secretary. M. Dale Mutz (Mutz) was also an FG vice president. Petitioner, Eastham, Burnett, and Olmstead were listed in the August 1983 Prospectus (the Prospectus) that was prepared in connection with the FG public stock offering. C. Subsidiaries
FG conducted substantially all of its business through wholly owned subsidiaries. During the years in issue, Finalco, Inc. (Finalco), was FG's principal subsidiary involved in equipment transactions. Finalco's principal offices were located in McLean, Virginia, during the years at issue. Blackwood Corporation (Blackwood) and Bluewood Corporation (Bluewood) were other FG subsidiaries. They acquired equipment from other leasing companies *465 and sold or otherwise transferred title to that equipment to Finalco. EDP Investments, Inc. (EDP), was another FG subsidiary. EDP was established to facilitate borrowing from unrelated lenders. At issue in this case are deductions relating to eight separate computer equipment transactions between petitioner and Finalco. Also at issue are deductions and credits attributable to many computer equipment transactions between Finalco and seven partnerships in which petitioner and other Finalco principals were partners. D. Leasing Transactions
From its inception through the years in issue, FG, through its subsidiaries, engaged in equipment leasing transactions. Specifically, FG would: (1) Negotiate and enter into a lease with an equipment "end user"; (2) purchase the equipment, financing the purchase with a lending institution; and, (3) resell the equipment in sale and leaseback transactions with independent third parties, or with an FG officer or director, or a general partner of a partnership. Most of the transactions at issue involved computer equipment. Finalco marketed its leasing program to potential equipment lessees or purchasers. After locating a potential lessee, *466 Finalco evaluated its creditworthiness. An end-user's credit was of importance to banks and other institutional lenders that provided Finalco with financing, as well as to third parties to whom Finalco resold the equipment. The aggregate rentals due under an end-user lease generally were sufficient to fully repay principal, interest, and prepayment charges on a loan that was collateralized by the end-user lease. In the event an end-user defaulted, FG and its subsidiaries insured that third-party investors were protected. The Prospectus describes FG's experience with end-user lessee defaults as follows: From the inception of the Company's leasing activities in 1968 through May 31, 1983, there have been defaults under a total of five leases * * *. In one such case, the Company arranged for a substitute lessee for the equipment subject to default. In the case of the four other defaults, the Company, voluntarily and at its own cost, arranged with the third-party buyers to substitute similar equipment on lease to other lessees. * * * In 1982, two lessees of equipment * * * filed for reorganization under Chapter XI of the Bankruptcy Act; however, such lessees have continued *467 to make their rent payments and no foreclosure action has been initiated by the lenders with respect to such equipment. Because the non-recourse lender bears the risk of non-collection of lease receivables, the Company does not have an allowance for doubtful accounts with respect to lease receivables.
Generally, there were three components to the purchase price when Finalco sold equipment to unrelated third-party investors: A cash downpayment, small equity notes, and a long-term installment note. However, petitioner's investment transactions (either individually or through partnerships) usually did not involve a cash downpayment. Furthermore, although equity notes were executed in connection with petitioner's transactions, they generally were nonrecourse. [6] The payment schedules of the equity notes were often ignored and frequently amended. *468 When it sold equipment to a third-party investor, Finalco simultaneously leased the equipment back from the investor. Rentals required to be paid by Finalco to the third-party investor under the terms of the leaseback equaled, or in certain cases exceeded, the payments of principal and interest payable by the third-party investor under the long-term installment note. Initially FG dealt only in Honeywell data processing equipment, primarily central processors. [7] By the years in issue, FG and its subsidiaries had diversified to other manufacturers' data processing equipment, as well as to other types of equipment such as aircraft, transportation equipment, and telecommunication equipment. As of August 1983, FG described its experience with other equipment in the Prospectus as follows: Because the Company has had only limited experience with types of equipment other than data processing equipment, the effect on residual values of the Company's diversification into other types of equipment during the past year cannot yet be evaluated.
*469 Finalco's competitors in the leasing business included Comdisco, Inc. (Comdisco), DPF Asset Management Corporation (DPF), Meridian Leasing Corporation (Meridian), and Utility Leasing Company (Utility Leasing). In some instances, Finalco or another FG subsidiary purchased leasing transactions structured by its competitors for resale to third-parties. The FG officers shared the responsibilities connected with the leasing business. Petitioner's responsibilities focused on obtaining bank financing and insuring that the lease documentation was correct. He negotiated with financial institutions and evaluated the creditworthiness of potential end-users. He reviewed an end-user's lease from an economic standpoint [8] to see that it conformed to the deal that had been approved. Petitioner also reviewed the Prospectus to insure that all of its statements were accurate. Olmstead and Eastham were responsible for dealing with the third-party investors who purchased equipment transactions from Finalco and structuring the transactions from the investor side. They also relied on outside counsel for advice on structuring transactions. Mutz and Burnett were responsible for Finalco's relationship *470 with the marketing staffs dealing with the equipment manufacturers and had direct contact with the equipment end-users. Mutz and Burnett reported to petitioner during portions of the years in issue. E. Petitioner's Investments
The Prospectus describes equipment transactions between FG and Finalco and their officers and directors as follows: From 1972 through March 1983, officers and directors of the Company, including Messrs. Prager, Eastham, Burnett and Olmstead, either in their individual *471 capacities or as general partners in partnerships organized to purchase equipment, purchased equipment from the Company in tax-advantaged sale and leaseback transactions. No transactions of this nature have been entered into since March 1983, and the Company has adopted a policy against any future sales of equipment to the foregoing four individuals. In the Company's equipment sales to officers and directors, sales were typically at prices approximately equal to the prices paid by the Company to acquire the equipment whereas in sales to unrelated parties the Company typically resells the equipment at a price 2% to 7% higher than its acquisition cost. In these transactions, the officers and directors paid for the equipment with promissory notes which, prior to July 1, 1982, with one exception, were non-recourse and payable solely out of the residual value of the specific equipment purchased in the transaction by the individual officer or director. In most cases the notes bear interest at the rate of 10% per annum. Notes executed after July 1, 1982 were full recourse. In tax-advantaged transactions with unrelated parties, the Company requires that the equity investment be paid *472 partly in cash and partly in full recourse equity notes bearing interest at rates higher than the rates under the notes executed by officers and directors. The equity invested by officers and directors in the equipment sold to those persons was lower than the equity invested in similar equipment in transactions entered into with unrelated parties. Equity invested by officers and directors in these transactions averaged 4.7% of the sale price of the equipment; in transactions with unrelated parties, the equity investment as a percentage of sales price typically exceeds 10%.
II. PETITIONER'S INDIVIDUAL TRANSACTIONS
At issue are eight equipment leasing transactions that petitioner entered into in his individual capacity. These transactions will hereinafter be referred to as follows: 1. GTE Data Services, Inc. (GTE)
2. Northwestern Bell Telephone Company (Northwestern) 3. Maas Brothers, Inc. (Maas)
4. Irving Trust Company (Irving Trust) 5. Unionbanc Computer Corporation (Unionbanc) 6. Satellite Business Systems (Satellite) 7. Martin Marietta Corporation (Martin Marietta) 8. Marriott Corporation (Marriott) The above abbreviations are the names of the equipment *473 end-users in the leasing transactions. Petitioners reported the following losses with respect to the individual equipment transactions on their joint Federal income tax returns for the years in issue: 1980 1981 1982 1983 1984 GTE
($ 30,632) ($ 21,483) ($ 18,630) ($ 15,447) ($ 11,896) Northwestern
(44)
(35)
(27)
(19)
(18)
Maas
(1,976)
(1,633)
(1,249)
(822)
(757)
Irving Trust
(54,518)
(48,890)
(42,611)
(35,605)
(27,789)
Unionbanc
(107,238)
(81,871)
(72,353)
(61,942)
(44,445)
Satellite
(55,919)
(50,507)
(49,944)
(44,138)
(37,787)
Martin
-- -- (112,624)
(45,023)
(33,432)
Marietta Marriott
-- -- (46,255)
(43,590)
(42,480)
Taxable
($ 250,327)
(204,419)
(343,693)
(246,586)
(198,604)
(loss) Petitioners reported the following income/losses with respect to the individual equipment transactions on their joint Federal income tax returns for 1985 through 1988 (i.e., the years subsequent to the years in issue): 1985
1986
1987
1988
GTE
$ 38,206  $ 42,627  $ 39,846 $ 1,793  Northwestern
(7)
79 700
--
Maas
(30)
10,378 5,275
--
Irving Trust
32,508 93,813 95,502
--
Unionbanc
145,233 158,857 173,759
--
Satellite
(2,041)
48,429 103,595
108,146
Martin Marietta
(8,884)
22,325 146,054
69,735
Marriott
(39,898)
(12.523)
29,455
76,227
Taxable (loss)
$ 165,087 $ 363,985 $ 594,186
$ 225,901
*474 Respondent determined the following "Rental Income" adjustments attributable to petitioner's individual equipment leasing transactions (the amounts shown are total amounts for each year): Year
Rental Income Adjustment
1980
$ 250,327
1981
204,419
1982
343,693
1983
246,586
1984
198,604
For each of petitioner's individual leasing transactions, we first find facts relating to the equipment acquisition by an FG subsidiary. [9] We will then find facts relating to petitioner's individual equipment purchases A. FINALCO, BLACKWOOD, AND BLUEWOOD EQUIPMENT ACQUISITIONS
1. GTE Equipment
Comdisco owned certain computer equipment that it leased to GTE pursuant to a master lease dated January 8, 1979 (the GTE end-user lease). The GTE end-user lease required monthly rental payments of $ 7,350 for 36 months. The GTE end-user lease contains the following indemnity provision: *475 Lessee [GTE] shall and does hereby indemnify and hold Lessor [Comdisco] and its assignee or Secured Party harmless from and against any and all claims, costs, expenses, damages and liabilities, including reasonable attorneys' fees, arising out of the ownership, selection, possession, leasing, renting, operation, control, use, maintenance, delivery, return or other disposition of the Equipment. * * *
The equipment covered by the GTE end-user lease is the equipment involved in petitioner's individual GTE transaction. NorLease, Inc. (NorLease), loaned Comdisco $ 214,607.96, which it used to purchase the GTE equipment. Comdisco executed a $ 214,607.96 non-recourse promissory note in favor of NorLease, dated September 1, 1979, with a maturity date of July 1, 1982 (the NorLease note). The NorLease note required 36 monthly payments of $ 7,350; i.e., parallel payments to those required to be made to Comdisco by GTE. The NorLease note was secured in part by the GTE equipment. The Security Agreement between Comdisco and NorLease provided that all of GTE's lease payments would be made directly to NorLease. This Security Agreement reiterated that Comdisco "has and shall have *476 no personal liability or obligation with respect to payment of the Indebtedness, which is payable solely from proceeds received by" NorLease from GTE. In a Purchase Agreement dated October 31, 1979, Comdisco sold used computer equipment, including the GTE equipment, to Blackwood, subject to existing liens and leases. The $ 3,118,676.91 purchase price was payable in cash, promissory notes, and assumption of debt. At the same time it purchased the GTE equipment, Blackwood entered into a Management and Remarketing Agreement with Comdisco. Comdisco was given the right to substitute items of equipment of "like kind" throughout the term of the Comdisco Remarketing Agreement. There is no evidence in the record concerning the terms of any sale or transfer of ownership of the GTE equipment from Blackwood to Finalco. Petitioner's Agreement of Assumption of a portion of the Comdisco loan from NorLease, however, recites that Finalco acquired Blackwood's interest in the equipment. 2. Northwestern Equipment
Finalco and EDP sought debt financing for equipment leased to Northwestern Bell from the Philadelphia Saving Fund Society (PSFS) and Manufacturers Bank. PSFS loaned funds to EDP *477 which, in turn, loaned funds to Finalco to purchase computer equipment in 1979. A portion of this equipment is the Northwestern equipment subsequently sold to petitioner. The Northwestern equipment was leased by Finalco to Northwestern Bell under a Master Lease Agreement dated October 23, 1979 (Northwestern end-user lease). On September 25, 1980, EDP, as assignee of Finalco, executed an Assignment of the Northwestern end-user lease to PSFS. A letter from petitioner indicated that Finalco had assigned the same Northwestern end-user lease to Merchants National Bank of Allentown approximately a year earlier (on October 23, 1979). On September 25, 1980, Finalco and EDP granted PSFS a security interest in the Northwestern equipment and the Northwestern end-user lease. The Security Agreement provided as follows: Section 7.01. Status of Obligations. Any provision in this Agreement to the contrary notwithstanding, no recourse shall be had against Finalco or EDP personally, any incorporator, shareholder, officer or director of Finalco or EDP, for any obligation of Finalco or EDP under or in respect of this Agreement or the Note. It is expressly understood that, as respects *478 the aforementioned persons, all such obligations are non-recourse obligations enforceable only against the Collateral * * *
3. Maas Equipment
The Maas equipment was leased by Finalco to Maas under a Master Lease Agreement dated July 22, 1977 (Maas end-user lease). The Maas equipment was the subject of Schedule 2 dated October 16, 1979, to the Maas end-user lease. On December 20, 1979, Finalco assigned the Maas end-user lease to Highland Community Bank as security for debt financing provided to Finalco. 4. Irving Trust Equipment
Comdisco owned certain computer equipment that it leased to Irving Trust pursuant to a master lease dated December 19, 1979. A portion of the equipment covered by this lease (the Irving Trust equipment) is the equipment involved in petitioner's Irving Trust transaction. The Irving Trust equipment that petitioner purchased was subject to the same Irving Trust Company User Lease as the equipment in the transactions identified as the Irving Transactions in Larsen v. Commissioner, 89 T.C. 1229 (1987), affd. sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). The transaction *479 entered into by petitioner with respect to the Irving Trust Equipment was structured identically to the Irving transactions in Larsen v. Commissioner, supra.
Citicorp Industrial Credit, Inc. (Citicorp), loaned Comdisco $ 4,075,348.79 that it used to purchase computer equipment, including the Irving Trust equipment. Comdisco executed a $ 4,075,348.79 non-recourse promissory note in favor of Citicorp, dated January 1, 1980, with a maturity date of December 1, 1982 (the Citicorp note). The Citicorp note was secured, in part, by the Irving Trust equipment. In a Purchase Agreement dated December 1, 1979, Comdisco sold used computer equipment, including the Irving Trust equipment, to Blackwood, subject to existing liens and leases. The $ 5,072,214.11 purchase price was payable in cash, a promissory note, and assumption of debt. Comdisco warranted and acknowledged that all debt assumed by Blackwood was non-recourse. Simultaneous with its purchase of the Irving Trust equipment, Blackwood entered into a management and remarketing agreement with Comdisco. There is no evidence in the record concerning the terms of any sale or transfer of ownership of *480 the Irving Trust equipment from Blackwood to Finalco. 5. Unionbanc Equipment
Comdisco owned certain computer equipment that it leased to Unionbanc pursuant to a master lease dated February 1, 1976 (Unionbanc end-user lease). The equipment covered by the Unionbanc end-user lease is the equipment involved in petitioner's Unionbanc transaction. In a Purchase Agreement dated June 29, 1978, Comdisco sold computer equipment and leases, including the Unionbanc equipment, to Bluewood, subject to existing liens and leases. The $ 1,685,839 purchase price was payable in cash, a promissory note, and assumption of the existing leases and loans. In connection with its purchase of the Unionbanc equipment, Bluewood executed a $ 55,000 promissory note, dated June 29, 1978. This note was executed by petitioner as vice president of Bluewood. With regard to this purchase, Financial Analytic Corporation (FG's predecessor) executed a "continuing, absolute and unconditional guaranty" of the "prompt and complete performance by Bluewood" of all of the terms and conditions of its Purchase Agreement with Comdisco. Financial Analytics Corp. agreed to: * * * indemnify and hold COMDISCO, Incorporated, *481 its successors and assigns, harmless from and against any and all liability, loss, damage or expense, including attorney's fees and court costs which COMDISCO, Incorporated, its successors and assigns, may incur or sustain by reason of the failure of Bluewood to fully perform and comply with the terms and conditions of said Agreements and the Promissory Note.
Simultaneous with its purchase of the Unionbanc equipment, Bluewood entered into a management and remarketing agreement with Comdisco (Comdisco Remarketing Agreement). By its terms, the Comdisco Remarketing Agreement expired when all of the equipment was resold. Comdisco was given the right to substitute items of equipment of the same model and condition throughout the term of the Comdisco Remarketing Agreement. There is no evidence in the record concerning the terms of any sale or transfer of ownership of the Unionbanc equipment from Bluewood to Finalco. Petitioner's Agreement of Assumption of a portion of the Comdisco loan from Citicorp recites that Finalco acquired the interest of Blackwood in the Unionbanc equipment. There is no evidence in the record concerning the terms of any sale or transfer of ownership of the *482 Unionbanc equipment from Bluewood to Blackwood. 6. Satellite Equipment
Unimark, Inc. (Unimark), owned certain computer equipment that it leased to Satellite pursuant to a Lease Agreement dated April 27, 1979 (the Satellite end-user lease). Prior to April 27, 1979, Finalco leased this equipment to Satellite. The equipment covered by the Satellite end-user lease is the equipment involved in petitioner's Satellite transaction. First American Bank of Virginia (First American) loaned Unimark $ 556,089.91 to purchase the Satellite equipment. Unimark executed a $ 556,089.91 non-recourse promissory note in favor of First American, dated April 27, 1979 (the Unimark note). The Unimark note was secured, in part, by the Satellite equipment and, in part, by the Satellite end-user lease. By a Purchase Agreement dated October 6, 1980, Finalco agreed to purchase the Satellite equipment and Satellite end-user lease from Shannon Financial Corporation (Shannon). The $ 477,975.20 purchase price was payable in cash and assumption of the existing debt in the amount of $ 437,411.81. The Purchase Agreement provided, however, that: Notwithstanding anything contained to the contrary herein, *483 Seller [Shannon] and Purchaser [Finalco] agree that Purchaser is not assuming any of the obligations, liabilities or indebtedness of the Debts, and Seller shall remain solely liable for all obligations, liabilities and indebtedness of such Debts.
Shannon also warranted that the $ 437,411.81 existing debt would be fully amortized through the Satellite end-user lease payments. One Bill of Sale executed on behalf of Shannon by its vice president on October 6, 1980, stated that the transfer of the Satellite equipment from Shannon to Finalco is "in consideration of Buyer's unconditional undertaking to cause to be paid the sum of $ 40,563.39." A subsequent Bill of Sale executed on behalf of Shannon by its president on November 14, 1980, stated that the transfer of the Satellite equipment from Shannon to Finalco is "in consideration of Buyer's unconditional undertaking to cause to be paid the sum of $ 46,663.39." The Purchase Agreement was revised to require $ 45,563.39 cash due on closing. Shannon transferred to Finalco its rights under the Satellite end-user lease by an Assignment of Lease dated October 6, 1980. There is no evidence in the record concerning how or when Shannon *484 obtained any interest in the Satellite equipment. 7. Martin Marietta Equipment
Buffalo Savings Bank (Buffalo) loaned Finalco $ 4,393,299.90 to purchase the computer equipment subject to the Martin Marietta lease. Finalco executed a non-recourse promissory note in favor of Buffalo for the full amount of the loan dated December 6, 1982. This note provided that: Any provision in this Note to the contrary notwithstanding, no recourse shall be had for the payment of the principal of or any interest or any other sums payable on this Note against Finalco personally or any incorporator, shareholder, officer or director of Finalco.
By Lease Agreement dated October 28, 1982, the Martin Marietta equipment was leased by Finalco to Martin Marietta. 8. Marriott Equipment
Continental Illinois National Bank and Trust Company of Chicago (Continental) loaned Finalco $ 994,464.65 to purchase the Marriott equipment. Finalco purchased the Marriott equipment from IBM in December 1982. Finalco entered a Lease Agreement with Marriott concerning the Marriott equipment on December 1, 1982 (Marriott end-user lease). On December 29, 1982, Finalco refinanced the Marriott equipment *485 purchase. Finalco executed a $ 969,103.18 non-recourse note to NSCC Leasing Corp. (NSCC) on December 29, 1982, concerning the Marriott equipment. With the NSCC refinancing, Continental released its security interest in the Marriott equipment. The NSCC note was secured, in part, by the Marriott equipment. B. PETITIONER'S INDIVIDUAL EQUIPMENT PURCHASES
1. Purchase Agreements
The purchase agreements for petitioner's individual equipment purchases from Finalco required the following equity and non-recourse installment notes (all of which were executed by petitioner): Date
Purchase Equity Installment
Transaction
of Purchase
Price
Note Note GTE
10/2/79
$ 279,160
$ 14,000
265,160
Northwestern
10/23/79
758
[1] 50
708
Maas
10/16/79
37,500
1,875
35,625
Irving Trust
12/1/79
618,906
30,000
588,906
Unionbanc
12/1/79
1,100,000
55,000
1,045,000
Satellite
12/14/80
671,025
33,550
637,475
Martin Marietta
12/30/82
1,126,244
[2] 27,919
[3]   Marriott
12/31/81
462,551
[2] 23,000
439,551
*486 The equipment used in these transactions included the following: End-User
Type of Equipment
GTE
IBM 3350 Disk Drive Equipment
Maas
IBM Data Processing Equipment
Irving
IBM 3284 & 3277 Peripheral Equipment
Unionbanc
IBM 370-158 Central Processor
Satellite
IBM 3350 Disk Drives & Associated Equipment
Martin Marietta
IBM 3380 Disk Drive Equipment
Marriott
IBM 3350 Disk Drive Equipment
With the exception of the Martin Marietta Purchase Agreement, all of the Purchase Agreements between petitioner and Finalco for his individual equipment purchases contained the following provisions: (9) Seller (Finalco) covenants to Buyer (petitioner) that Seller shall, (i) fully pay (or cause to be paid) and perform any and all obligations, liabilities and indebtedness (collectively "Debts") secured by any liens (other than those arising by or through Buyer) against the Equipment ("Liens"), when due, and (ii) at such time as the Installment Note and the Equity Note (collectively, the "Notes") are paid in full, eliminate any and all such Liens. * * * (12) Seller (Finalco) hereby indemnifies Buyer (petitioner) and holds Buyer harmless from and against (i) any and all loss, cost, damage, *487 injury or expense (including, without limitation, Court costs and reasonable attorneys' fees) whatsoever and howsoever arising which Buyer or any of its agents or employees may incur by reason of any breach by Seller of any of the covenants, warranties or representations by, or obligations of, Seller set forth in the Agreement * * *
2. Equity and Nonrecourse Installment Notes
The equity notes for the Unionbanc and Satellite equipment purchases (including principal and accrued interest) were payable entirely from residuals in 1987 and 1988, respectively. The schedule for payment of the principal and accrued interest of the GTE, Maas, and Irving Trust equity notes was set forth in the notes. Petitioner did not make the principal and interest payments when due. On June 1, 1982, petitioner executed Amendments, amending the equity notes he had executed as part of the GTE, Maas, Irving Trust, Unionbanc, and Satellite equipment purchases. The sole signatory of these Amendments was petitioner in his individual capacity. Petitioner did not make the principal and interest payments required under the Amendments to the Promissory Note in accordance with the amended payment schedules. *488 The GTE, Unionbanc, and Satellite Installment Notes provided that: Anything herein to the contrary notwithstanding, this Installment Note is a non-recourse obligation of the Buyer and liability of the Buyer to make payments of principal and interest on this Note is limited solely to payments out of the rents under any lease of the Equipment securing this Installment Note, and any other use or sale of the Collateral, and no holder of this Note shall have recourse to the Buyer or to any assets of the Buyer in the event that such rents, Collateral and proceeds shall not be sufficient to fully discharge the liability of the Buyer hereunder.
The Northwestern, Maas, and Marriott Installment Notes provide that: Seller agrees, for its self [sic] and its successors and assigns and any holder hereof, that notwithstanding anything to the contrary contained herein (a) Buyer's Obligations shall be satisfied solely out of the rentals and other sums payable under any lease of the Equipment securing this Installment Note, or any other use or sale of the Collateral, and (b) Seller shall have no right to satisfy any of Buyer's Obligations out of any other property of Buyer, provided *489 that nothing shall prevent Seller from exercising his rights with respect to the Collateral in the event of nonpayment of the Obligations.
3. Leases
In each of the above transactions in which petitioner, as an individual, purchased equipment from Finalco, he leased the equipment back to Finalco on the same day he purchased the equipment. All of the payments that petitioner was required to make on his installment notes to Finalco for the GTE, Northwestern, Maas, Irving Trust, Unionbanc, Satellite, and Marriott equipment were made by offsetting book entries crediting him with the lease payments due from Finalco. [10] Petitioner concedes that he was not "at risk" within the meaning of section 465 with regard to the GTE, Irving Trust, or Unionbanc non-recourse installment notes. The rent payable to petitioner under the Martin Marietta *490 lease was paid directly to Buffalo. These lease payments were credited on Finalco's books as follows: Year
Rental Income
Interest Expense
Principal Payments
1983
$ 301,050
$ 120,824
$ 180,226
1984
301,050
109,233
191,817
With the exception of the Martin Marietta lease (which was not introduced into evidence), each of the leases between petitioner and Finalco provided: 6. Indemnification. Except for the willful or negligent actions or inactions of Lessor, its agents and employees, Lessee hereby agrees to indemnify, protect, save and keep harmless Lessor and its agents and employees from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions and suits, including legal expenses, of whatsoever kind and nature, imposed on, incurred by or asserted against Lessor because of the ownership, possession, use or operation of the Equipment during the Term of the Lease. All the indemnities contained in any section of this Lease shall continue in full force and effect notwithstanding the expiration or other termination of this Lease and are expressly made for the benefit of, and shall be enforceable by, Lessor. [hereinafter *491 "Indemnification Provision"]
With the exception of the Martin Marietta lease, the Lease Agreements between petitioner and Finalco also provided that Finalco may exchange, i.e., substitute, the equipment subject to the lease for other units of equipment of equal fair market value. As security for his payment to Finalco of the purchase price in the GTE, Northwestern, Maas, Irving Trust, Unionbanc, Satellite, and Marriott transactions, petitioner assigned his rights in his lease with Finalco to Finalco. 4. Security and Remarketing Agreements
Pursuant to the Purchase Agreements, petitioner executed a Security Agreement in connection with each of his individual equipment purchases from Finalco (except for the Martin Marietta transaction). In these Security Agreements relating to the GTE, Irving Trust, Unionbanc, and Satellite equipment, Finalco waived "pursuant to the provisions of the Uniform Commercial Code any and all rights to take a deficiency judgement" against petitioner. In addition to the documents required in the Purchase Agreements, in connection with the GTE, Northwestern, Maas, Irving Trust, Unionbanc, and Satellite transactions, petitioner and Finalco executed *492 Remarketing Agreements, Agreements as to Prior Liens, Encumbrances and Assignments, and/or Residual Sharing Agreements. 5. Agreements of Assumption
1. On October 2, 1979, petitioner executed an Agreement of Assumption assuming $ 132,000 of Comdisco's September 1, 1979, non-recourse promissory note to NorLease for purchase of the GTE Equipment. This assumption stated that it "shall be on a full recourse basis." Petitioner was the sole signatory of this Agreement. The provisions for signature on behalf of Comdisco and NorLease are unexecuted. 2. On October 23, 1979, petitioner executed an Agreement of Assumption assuming $ 303 of Finalco's non-recourse obligation incurred for the purchase of the Northwestern equipment. This assumption stated that it "shall be on a full recourse basis." Petitioner was the sole signatory of this Agreement. The provision for signature on behalf of the lender is unexecuted. 3. On October 16, 1979, petitioner executed an Agreement of Assumption assuming $ 15,000 of Finalco's obligation incurred for the purchase of the Maas equipment. This assumption stated that it "shall be on a full recourse basis." Petitioner was the sole signatory *493 of this Agreement. The provision for signature on behalf of the lender is unexecuted. 4. On December 1, 1979, petitioner executed an Agreement of Assumption assuming $ 221,822 of Comdisco's January 1, 1980, non-recourse promissory note to Citicorp for purchase of the Irving Trust Equipment. This assumption stated that it "shall be on a full recourse basis." Petitioner was the sole signatory of this Agreement. The provisions for signature on behalf of Comdisco and Citicorp are unexecuted. 5. On December 1, 1979, petitioner executed an Agreement of Assumption assuming $ 537,997 of Comdisco's March 1, 1976, obligation for purchase of the Unionbanc equipment. This assumption stated that it "shall be on a full recourse basis." Petitioner was the sole signatory of this Agreement. The provisions for signature on behalf of Comdisco and Citicorp are unexecuted. 6. On December 14, 1980, petitioner executed an Agreement of Assumption assuming $ 269,131 of Shannon's April 27, 1979, non-recourse promissory note to First American for purchase of the Satellite equipment. This assumption stated that it "shall be on a full recourse basis." Petitioner was the sole signatory of this *494 Agreement. The provisions for signature on behalf of Shannon and First American are unexecuted. 7. Petitioner executed an Assignment and Assumption Agreement dated December 30, 1982, which provided for petitioner's assumption of $ 300,000 of Finalco's non-recourse debt to Buffalo relating to the Martin Marietta equipment. JFO, Ltd., Olmstead, Eastman, and Burnett also are identified as "buyers" in this Assignment and Assumption Agreement and are listed as assuming a portion of Finalco's nonrecourse debt to Buffalo relating to the Martin Marietta equipment. All of the "buyers", including petitioner, agreed to be bound by the terms of Finalco's note to Buffalo but assume personal liability for their stated amount of the note (i.e., $ 300,000 each with Olmstead's share split evenly between himself and JFO, Ltd.). The Assignment and Assumption Agreement was not signed on behalf of Finalco or Buffalo. 8. On January 31, 1982, petitioner executed an Agreement of Assumption assuming $ 178,021 of Finalco's non-recourse promissory note to NSCC for purchase of the Marriott Equipment. This assumption stated that it "shall be on a full recourse basis." Petitioner is the sole signatory *495 of this Agreement. The provision for signature on behalf of the lender is unexecuted. 6. Petitioners' Joint Federal Income Tax Returns
Petitioner reported the following items with respect to the GTE equipment purchase and leaseback on petitioners' joint Federal income tax returns for the years in issue: 1980 1981 1982 1983 1984 Rental income
$ 49,529 $ 49,529 $ 49,529 $ 49,529 $ 49,529 Interest expense
27,431 24,873 22,020 18,837 15,286 Depreciation
52,730 46,139 46,139 46,139 46,139 Taxable (loss)
(30,632)
(21,483)
(18,630)
(15,447)
(11,896)
Petitioner reported the following items with respect to the Northwestern equipment purchase and leaseback on petitioners' joint Federal income tax returns for the years in issue: 1980
1981
1982
1983
1984
Rental income
$ 132 $ 132 $ 132 $ 132 $ 132 Interest expense
76 67 59 51 42 Depreciation
100 100 100 100 108 Taxable (loss)
(44)
(35)
(27)
(19)
(18)
Petitioner reported the following items with respect to the Maas equipment purchase and leaseback on petitioners' joint Federal income tax returns for the years in issue: 1980
1981
1982
1983
1984
Rental income
$ 6,654 $ 6,654 $ 6,654 $ 6,654 $ 6,654 Interest expense
3,685 3,342 2,958 2,531 2,054 Depreciation
4,945 4,945 4,945 4,945 5,357 Taxable (loss)
(1,976)
(1,633)
(1,249)
(822)
(757)
*496 Petitioner reported the following items with respect to the Irving Trust equipment purchase and leaseback on petitioners' joint Federal income tax returns for the years in issue: 1980
1981
1982
1983
1984
Rental income
$ 110,001 $ 110,001 $ 110,001 $ 110,001 $ 110,001 Interest expense
61,368 55,740 49,461 42,455 34,639 Depreciation
103,151 103,151 103,151 103,151 103,151 Taxable (loss)
(54,518)
(48,890)
(42,611)
(35,605)
(27,789)
Petitioner reported the following items with respect to the Unionbanc equipment purchase and leaseback on petitioners' joint Federal income tax returns for the years in issue: 1980
1981
1982
1983
1984
Rental income
$ 182,346 $ 182,346 $ 182,346 $ 182,346 $ 182,346 Interest expense
81,806 80,884 71,366 60,955 49,568 Depreciation
207,778 183,333 183,333 183,333 177,223 Taxable (loss)
(107,238)
(81,871)
(72,353)
(61,942)
(44,445)
Petitioner reported the following items with respect to the Satellite equipment purchase and leaseback on petitioners' joint Federal income tax returns for the years in issue: 1980
1981
1982
1983
1984
Rental income
-0-  $ 111,235 $ 111,235 $ 111,235 $ 111,235 Interest expense
-0-  49,904 49,341 43,535 37,184 Depreciation
$ 55,919 111,838 111,838 111,838 111,838 Taxable (loss)
(55,919)
(50,507)
(49,944)
(44,138)
(37,787)
*497 Petitioner reported the following items with respect to the Martin Marietta equipment purchase and leaseback on petitioners' joint Federal income tax returns for the years in issue: 1982
1983
1984
Rental income
-0- $ 301,050 $ 301,050 Interest expense
-0- 120,824 109,233 Depreciation
$ 112,624 225,249 225,249 Taxable (loss)
(112,624)
(45,023)
(33,432)
Petitioner reported the following items with respect to the Marriott equipment purchase and leaseback on petitioners' joint Federal income tax returns for the years in issue: 1982
1983
1984
Rental income
-0- $ 86,841 $ 86,841 Interest expense
-0- 37,921 36,811 Depreciation
$ 46,255 92,510 92,510 Taxable (loss)
(46,255)
(43,590)
(42,480)
III. PETITIONER'S TRANSACTIONS THROUGH PARTNERSHIPS
The second series of transactions at issue is numerous equipment leasing transactions entered into by partnerships in which petitioner was a partner. These partnerships include AUC Partnership, Brae Partnership, East Gate Leasing Company, Greensboro Associates, Javelin Leasing Company, Montgomery-35 Leasing Company, and Pony Partnership. The interests in each of these *498 partnerships were, with the exception of minor interests in Greensboro and Javelin, owned either directly or indirectly by Finalco principals. These partnerships were created in order to enter into transactions with Finalco and, essentially, had no assets other than those acquired in the sale and leaseback transactions. During 1979 through 1984, the partnership records of all of these partnerships were maintained by Finalco employees and were located on Finalco's premises. We will find facts with respect to each of these partnerships and their transactions separately. A. AUC PARTNERSHIP
On January 1, 1979, AUC Partnership (AUC) was formed as a limited partnership. On the same day, AUC was changed from a limited to a general partnership, and had the following general partners: Partner
Partnership Interest
Petitioner
20%
Olmstead
20%
Burnett
20%
Mutz
20%
Eastham
20%
As of September 1, 1984, Mutz assigned his AUC partnership interest to FG. 1. AUC's U.S. Partnership Returns of Income
AUC's U.S. Partnership Returns of Income for 1979, 1980, 1981, 1982, 1983, and 1984 reflect the following items: 1979
1980
1981
1982
Total income
$ 485,250 $ 307,224
$ 290,114
$ 504,991 Interest deduction
101,203 -0-  -0-  -0-  Depreciation deduction
624,381 305,971
279,881
577,345 Ordinary income (loss)
(240,334)
1,253
10,033
(72,554)
*499 1983
1984
Total income
$ 556,903
$ 487,687
Interest deduction
-0- -0- Depreciation deduction
454,188
360,151
Ordinary income (loss)
102,515
127,336
The "Liabilities and Capital" portions of Schedules L of AUC's partnership returns for 1979, 1980, 1981, 1982, 1983, and 1984 reflect the following items: 1979
1980
1981
Nonrecourse loans
$ 1,477,285 $ 1,313,877 $ 1,135,170 Mortgages, notes,  and bonds payable  in 1 year or more  70,900 44,005 44,005 Partners' capital
accounts (230,334)
(356,403)
(457,577)
1982
1983
1984
Nonrecourse loans
$ 1,855,628 $ 1,530,874 $ 1,171,953 Mortgages, notes,
and bonds payable  in 1 year or more  98,005 81,548 71,427 Partners' capital
accounts
(730,865)
(810,675)
(837,358)
Petitioner's Schedules K-1 for AUC for 1979, 1980, 1981, 1982, 1983, and 1984 reflect the following items: Capital
Ordinary
Account
Gain/Loss 1979
($ 46,067) ($ 48,067)
1980
(71,280)
251 1981
(91,516)
2,006 1982
(146,174)
(14,511)
1983
(162,136)
20,503 1984
(167,471)
25,468  2. Notice of Deficiency
The following adjustments relating to AUC are raised in the *500 notice of deficiency and are in dispute: Net
Investment
Year
Income/(loss)
Interest Expense
1980
($ 251)  $ 25,464
1981
(2,046)
22,242
1982
14,471
40,147
1983
[1] [1] 1984
[1] [1] 3. Computer Equipment Transactions
a. MAAS Brothers, D.M. Read, Jordan Marsh, Whirlpool, Gibbs & Hill, Keebler, Textron, and PA Electric
During 1979, AUC purchased computer equipment from Finalco (as designated by end-user) as follows: Date
End User
1/15/79
MAAS Brothers
1/15/79
D.M. Read
1/15/79
Jordan Marsh
1/5/79
Whirlpool
3/6/79
Gibbs & Hill
4/1/79
Keebler
2/1/79
Textron
2/1/79
PA Electric
The Purchase Agreement for each of these transactions sets forth the following total purchase price, cash downpayment, and installment note: Cash End User
Total Price
Downpayment
Installment Note
MAAS Brothers
$ 160,050  $ 21,000 $ 139,050  D.M. Read
140,600
18,500
122,100
Jordan Marsh
290,330
38,000
252,330
Whirlpool
37,500
5,000
32,500
Gibbs & Hill
125,000
3,500
121,500
Keebler
155,326
20,000
135,326
Textron
613,470
18,500
594,970
PA Electric
13,000
400
12,600
$ 1,535,276
$ 124,900
$ 1,410,376
*501 AUC executed installment notes in accordance with the Purchase Agreements for these transactions. AUC did not make any of the cash downpayments required under the Purchase Agreements in the above transactions. In lieu of these downpayments, AUC executed a Promissory Note and Security Agreement to Finalco equal to the amount of the stated downpayment in each transaction. On May 2, 1979, Finalco needed additional equipment to sell to third-party investors. Thus, AUC resold the above equipment to Finalco. Finalco assumed AUC's liability to it on the outstanding balance of the installment notes, [11] and canceled the $ 124,900 aggregate unpaid balance of the promissory notes executed in lieu of cash downpayments. AUC's 1979 U.S. Partnership Return of Income reflects the following items claimed with regard to the above transactions: Sales Price to
Ordinary
Depreciation
End User
Finalco Gain
Deduction MAAS Brothers
$ 154,960  $ 17,774 $ 22,864 D.M. Read
136,131
15,617
20,086
Jordan Marsh
281,094
32,240
41,476
Whirlpool
36,310
4,167
5,357
Gibbs & Hill
122,386
15,243
17,857
Keebler
NONE NONE [1] Textron
596,196
70,365
87,639
PA Electric
12,634
1,491
1,857
$ 1,339,711
$ 156,897
$ 197,136
*502 b. Illinois Bell
By Purchase Agreement dated March 1, 1979, AUC agreed to purchase equipment used by IllinoisBell Telephone Company from Finalco for a total purchase price of $ 75,000 (the Illinois Bell equipment). This Purchase Agreement provided for a $ 2,000 cash downpayment and a $ 73,000 installment note. AUC executed the $ 73,000 installment note. In lieu of the required cash downpayment, AUC executed a $ 2,000 promissory note. By a "Sale and Release Agreement" dated June 4, 1979, AUC resold the Illinois Bell equipment to Finalco in exchange for an assumption of the outstanding balance on AUC's $ 73,000 installment note and Finalco's agreement to cancel the unpaid $ 2,000 promissory note. The purchase and sale of the Illinois Bell equipment is not reflected on AUC's 1979 U.S. Partnership Return of Income. c. Alstores Realty
By Purchase Agreement dated May 9, 1979, AUC agreed to purchase equipment used by Alstores Realty from Finalco for a total purchase price of $ 410,600 (Alstores Realty equipment). Finalco agreed that the Purchase Agreement, ancillary installment notes, and other documents would be null and void, and that Finalco would return all moneys *503 paid by AUC if: (1) any security interest held by any other party was not released upon payment in full of the purchase price within one year; or, (2) if Finalco gave AUC written notice that it did not intend to pay the full purchase price and obtain a release of such security interest.
The Purchase Agreement for the Alstores Realty equipment provided for a $ 53,000 cash downpayment and a $ 357,600 installment note. AUC executed the $ 357,600 installment note. In lieu of the required cash downpayment, AUC executed a $ 53,000 promissory note. By a "Sale and Release Agreement" dated June 1, 1979, AUC resold the Alstores Realty equipment to Finalco in exchange for an assumption of a $ 357,578 outstanding balance on AUC's installment note and Finalco's agreement to cancel the unpaid $ 53,000 promissory note. AUC claimed a $ 58,657 depreciation deduction for the Alstores Realty equipment on its 1979 U.S. Partnership Return of Income. d. Wang, Allied, Regency, NWBT #1, NWBT #2, Wallace, and Ford
Adjustments relating to the following AUC equipment purchases from Finalco (identified by end-user) are also in issue: Date of Purchase
End User
1/12/79
Wang Laboratories (Wang)
1/15/79
Allied Stores Mktg. Corporation (Allied)
4/1/79
Regency Electron (Regency)
4/1/79
Northwestern Bell Tele. Co. (NWBT #1)
4/1/79
Northwestern Bell Tele. Co. (NWBT #2)
3/31/79
Sam P. Wallace Co. Inc. (Wallace)
4/15/79
Ford Motor Company (Ford)
*504 With the exception of the Wallace equipment, documents reflecting Finalco's acquisition of the above equipment were neither provided by petitioner to respondent nor offered into evidence. Finalco purchased the Wallace equipment from Wallace on March 31, 1979, for $ 48,165. By a Bill of Sale dated April 1979, Wallace acquired the Wallace equipment from Northern Telecom Systems Corporation for $ 48,165. Purchase Agreements
The Purchase Agreements for the AUC equipment purchases from Finalco set forth the following total purchase price, cash downpayment, note, and debt assumption information: Total
Cash Installment
Equity
Debt
Transaction
Price
Downpayment
Note Note
Assumption
Wang
$ 62,607  $ 7,500 $ 55,107  n/a
n/a
Allied
49,100
6,400
42,700
n/a
n/a
Regency
[1] 728,102
20,000
708,102
n/a
n/a
NWBT #1
16,865
2,000
14,865
n/a
n/a
NWBT #2
61,280
8,000
53,280
n/a
n/a
Wallace
[2] 64,220
9,000
55,220
n/a
n/a
Ford
681,457
0  423,457
$ 18,000
$ 240,000
$ 1,663,631
$ 52,900
$ 1,352,731
$ 18,000
$ 240,000
*505 The equipment used in these transactions included the following: End-User
Type of Equipment
Wang
Certain Computer Related Equipment
Regency
IBM 370-148 Central Processor
& Peripheral Equipment
NWBT #1
Ontel Computer Equipment
NWBT #2
Ontel Computer Equipment
Wallace
Sycor Terminal Equipment
Ford
Honeywell Information System
CSU 6001 Computer with Peripheral
Equipment
Installment and Equity Notes
AUC executed installment notes for its transactions involving the Wang, Allied, Regency, NWBT #1, NWBT #2, and Wallace equipment. Each of these notes states that AUC agrees to guarantee a certain amount of Finalco's indebtedness incurred to acquire the equipment as set forth in a "Guarantee of Payment." No such documents were offered into evidence. The installment notes provided that any amount of the note above the guaranteed amount was non-recourse. AUC did not make any of the cash downpayments required under the Purchase Agreements in the Wang, Allied, Regency, NWBT #1, NWBT #2, and Wallace equipment transactions. In lieu of the required cash downpayments, AUC executed a Promissory Note and Security Agreement to Finalco equal to the amount of the stated downpayment *506 in each transaction. Stated below are further details regarding some of the installment and equity notes: 1. Regency Equipment
As originally executed, the $ 20,000 Promissory Note and Security Agreement related to the Regency Equipment purchase was non-recourse and principal and accrued interest totaling $ 27,372.07 was payable entirely out of residuals in 1986. On June 1, 1982, AUC executed an Amendment to the promissory note. This Amendment required payments commencing July 1, 1981, and did not specify the source of the payments. The only signatory to this amendment was Olmstead, as a general partner of AUC. On June 21, 1979, Finalco executed a non-recourse $ 496,609.07 promissory note to NSCC Leasing Corp. (NSCC). Collateral for this note included AUC's Installment Note (of $ 708,102), a Security Agreement and Lease Agreement relating to the Regency equipment, as well as Finalco's lease agreement with Regency. By Agreement dated as of April 1, 1979, Finalco and AUC agreed that payment of $ 75,000 due from AUC to Finalco on January 1, 1987, and related to the Regency equipment, was payable out of residuals. The Agreement further provided that: Anything in this *507 promissory note, the purchase agreement, or any other document to the contrary notwithstanding, payee [Finalco] agrees to look solely and only to the collateral for the payment, performance and observance of all of the obligations hereunder [of AUC].
On November 7, 1979, each of the AUC partners signed an Agreement of Assumption which stated that they each, individually, assumed personal liability for $ 80,000 of Finalco's non-recourse debt to NSCC in connection with the Regency equipment. This Agreement of Assumption was signed on behalf of NSCC. The partners did not assume personal liability for any portion of AUC's debt to Finalco in connection with its purchase of the Regency equipment from Finalco nor did the AUC partnership assume recourse liability for any portion of Finalco's debt to NSCC. 2. NWBT #2 Equipment
The NWBT #2 promissory note provided that the entire principal plus interest, in a total amount of $ 9,073.29, was payable in 1980. On June 1, 1982, AUC executed an Amendment to the promissory note extending the payment of principal and interest from July 1, 1980, to July 1, 1985. The only signatory to the Amendment was Olmstead as a general partner of *508 AUC. 3. Wallace Equipment
The $ 9,000 Promissory Note and Security Agreement executed by AUC in connection with the purchase of the Wallace equipment was non-recourse, and the principal and accrued interest totaling $ 16,640.71 was payable entirely out of residuals in 1986. On June 1, 1982, AUC executed an Amendment to the promissory note, requiring payments of principal and accrued interest commencing on July 1, 1983, and ending July 1, 1986. The only signatory to the amendment was Olmstead as a general partner of AUC. 4. Ford Equipment
As part of the payment for the Ford equipment, on July 31, 1979, AUC executed an Agreement of Assumption in favor of The Philadelphia Saving Fund Society (PSFS). This assumption referred to a July 31, 1979, loan agreement between EDP and PSFS evidenced by a $ 240,000 "Seller's Note" and a $ 640,000 "Other Note." AUC agreed to assume EDP's obligations under the Seller's Note "upon the terms and conditions provided for therein." The Assumption Agreement further provided: the undersigned [AUC] hereby assumes and agrees to pay, perform and observe the Obligations [under the Seller's Note], on a full recourse basis, and otherwise *509 upon the terms and conditions provided for in the Seller's Note, it being understood and agreed that the undersigned does not assume or agree to discharge any other obligation of Assignor to the Bank, including, without limitation, any obligations on account of the Other Note or the loans evidenced thereby.
PSFS signed the Assumption Agreement accepting the agreement after deleting the provision releasing EDP from its obligations under the Seller's Note. The Seller's Note was dated August 3, 1979, after liability for a portion of it was to be assumed by AUC. The Seller's Note required monthly payments of $ 6,559.02, and referred to a Security Agreement between PSFS and EDP dated August 3, 1979, for a description of "the rights of the holder of the Note and others in respect of the Note". AUC and PSFS executed an Agreement of Assumption dated December 21, 1979. Pursuant to this agreement, the AUC partners each were to assume personal liability on a full recourse basis for repayment of $ 48,000 of EDP's/Finalco's obligation to PSFS. This Agreement was accepted on behalf of PSFS. AUC executed a $ 423,457 non-recourse installment note in accordance with the Ford Purchase Agreement. *510 In lieu of the cash downpayment required in the Ford Purchase Agreement, AUC executed a Promissory Note. The Ford promissory note provided that the principal plus interest in a total amount of $ 19,440 was payable on May 1, 1980. On June 1, 1982, AUC executed an Amendment to the promissory note which provided that the principal and interest in a total amount of $ 26,772.12 would be paid in three payments due on July 1, 1983, July 1, 1984, and July 1, 1985. The sole signatory of the amendment was Olmstead as a general partner of AUC. Remarketing and Agency Agreements
AUC and Finalco entered into Remarketing and Agency Agreements with respect to the NWBT #1, NWBT #2, Wallace, and Ford equipment. Under these agreements Finalco was given sole discretion to release or dispose of the equipment on whatever terms it deemed appropriate. e. Lockheed and Gateway
Adjustments relating to AUC's purchase of Honeywell equipment from Gateway Aviation Holdings, Ltd. (Gateway), are also in issue. This equipment was used by Lockheed Corp. (Lockheed). Pursuant to a Purchase Agreement dated December 23, 1981, Gateway purchased from Finalco a Honeywell Information System 8610 central *511 processor with peripheral equipment, which was leased to Lockheed (the Lockheed equipment). The stated purchase price was $ 1,076,015, payable by a $ 51,500 recourse promissory note and a $ 1,024,515 full recourse installment promissory note. Contrary to the notes, the Purchase Agreement limited Gateway's liability as follows: 8.5 Limited-recourse. Anything in this Agreement to the contrary notwithstanding, Seller [Finalco] shall look solely and only to the Collateral (as defined in the Limited Recourse Note) for the Payment by Buyer [Gateway] of all of its obligations under the Documents, other than (i) the Buyer's Section 7.1 Recourse Obligations (as defined in the Limited Recourse Note), (ii) its obligations under the Recourse Note * * *
In connection with its purchase from Finalco, Gateway executed a document entitled "Full Recourse Installment Promissory Note" dated December 23, 1981, in the amount of $ 1,024,515. By letter dated December 23, 1981, Finalco consented to the resale of the Lockheed equipment by Gateway to AUC. By Purchase Agreement dated the same day, AUC agreed to purchase the Lockheed equipment from Gateway for a total purchase price of $ 1,078,515. *512 The Purchase Agreement contained the following provision: 6. Indemnification. Each of Seller and Buyer will indemnify the other and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorney's fees, wheresoever and howsoever arising which the other party or its subsidiaries or stockholders, or any of its, or their, directors, officers, agents, employees, stockholders or partners, may incur by reason of any material breach by the indemnifying party of any of its representations or obligations set forth in the Documents * * * [hereinafter Indemnification Provision (2)]
As part of the Lockheed equipment purchase price, AUC executed a $ 1,024,515 Limited Recourse Promissory Note-Security Agreement. AUC's maximum aggregate amount of recourse obligations was limited to $ 317,159. As security for payment of its limited recourse note, AUC assigned to Gateway all of the monthly rental payments that it was to receive from Finalco under its equipment lease to Finalco. All payments on AUC's note to Gateway were made by application of amounts due AUC from Finalco under its lease *513 of the Lockheed equipment. Also, as part of the Lockheed equipment purchase price, AUC executed a $ 54,000 Promissory Note dated December 23, 1981. No payments were due on this note for approximately 2-1/2 years; i.e., until July 1, 1984. Gateway executed a Bill of Sale dated December 23, 1981, to AUC concerning the Lockheed equipment. Page 2 of schedule A of the Bill of Sale stated that the equipment purchase from Honeywell would be financed by Finalco's obtaining a loan from a lending institution selected by it in its sole discretion and that the amount of the acquisition loan would be paid by Finalco over the term of the Existing Underlying Lease out of the rental proceeds therefrom. By letter dated December 23, 1981, Finalco accepted delivery of AUC's promissory note as a substitute for Gateway's recourse note and agreed to refund to Gateway the $ 2,500 by which AUC's note exceeded Gateway's note. By another letter dated December 23, 1981, Finalco consented to Gateway's assignment to AUC of all its benefits under the purchase agreement, including the indemnification provision between Gateway and Finalco. By Agreement of Lease dated December 23, 1981, AUC leased the Lockheed *514 equipment to Finalco. This lease contained the following indemnification provision: 17. Indemnification. 17.1 Lessee [Finalco] will indemnify Lessor [AUC] and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorneys' fees, wheresoever and howsoever arising which Lessor or its subsidiaries or shareholders, or any of its or their directors, officers, agents, employees, stockholders or partners, may incur by reason of any breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease * * *
Simultaneously, by Assignment of Lease Agreement, AUC assigned its right, title, and interest in its lease agreement with Finalco to Gateway as security for its payment of its Limited Recourse Promissory Note-Security Agreement. By letter dated December 23, 1981, AUC instructed Finalco to make payments due under its lease of the Lockheed equipment directly to Gateway to pay AUC's limited recourse note to Gateway. As described above, this note had already been assigned by Gateway to Finalco. [12]
*515 AUC signed an Agreement of Assumption dated December 23, 1981, to assume personal liability for $ 317,159 of Finalco's obligation to the underlying lender with respect to the Lockheed equipment. This assumption was not signed by the lender. Finally, AUC and Finalco entered into a Remarketing and Agency Agreement dated February 1, 1984, with respect to the Lockheed equipment (because Lockheed had indicated its intention to discontinue usage of the equipment). Finalco was authorized, in its sole discretion, to lease or sell the equipment in any manner it deemed advisable. B. MONTGOMERY-35 LEASING COMPANY
Montgomery-35 Leasing Company (Montgomery-35) was a general partnership. With the exception of the JFO Trusts during part of 1983 and 1984, Montgomery-35's partners were as follows during the years in issue: Name
Grantor
Partnership Interest
Virginia Trusts
J. Prager
30.113%
Drumaldy Trusts
M. Jennings
23.876%
Potomac Trusts
M. Mutz
20.758%
JFO Trusts
J. Olmstead
20.758%
Joel Davis
n/a
4.495%
In 1983, the JFO Trusts partnership interest was transferred to Gateway Aviation Holdings, Ltd. Petitioner established the Virginia Trusts, comprised of the Landmark *516 Trust and the Clarendon Trust, on October 1, 1972. As of May 21, 1984, petitioners' children were the beneficiaries of the Landmark and Clarendon Trusts. Petitioners reported the following net partnership income attributable to Montgomery-35 on their joint Federal income tax returns: Year
Income
1980
$ 47,749 1981
105,399
1982
105,941
1983
177,845
1984
198,050
The following adjustments relating to Montgomery-35 were raised in respondent's notice of deficiency and are in dispute:
1980
1981
1982
1983
1984
Net income/(loss)
($ 3,731) ($ 770)
($ 1,249)
--
--
Investment Interest
expense
70,483 --
--
--
--
Pursuant to a letter agreement dated July 27, 1972, Finalco agreed to perform remarketing services for Montgomery-35's equipment acquisition from Finalco. 1. 1973 Equipment Transactions
Pursuant to a Purchase Agreement dated August 21, 1973, Montgomery-35 agreed to purchase two units of Honeywell data processing equipment (the Questor Equipment) from Finalco for $ 2,400. [13] As payment for the Questor Equipment, Montgomery-35 delivered an Installment Note secured by a Security Agreement. Montgomery-35 agreed in that Note that the *517 Questor Equipment could be exchanged, surrendered or sold from time to time. The Installment Note was non-recourse and explicitly provided that none of Montgomery-35 partners were personally liable for Montgomery-35's obligations. Simultaneously, on August 21, 1973, Montgomery-35 and Finalco entered into a Master Lease Agreement, whereby Montgomery-35 leased the equipment to Finalco. Finalco agreed to indemnify Montgomery-35 as follows: 6. Indemnification. Lessee hereby agrees to indemnify, protect, save and keep harmless Lessor and its agents and employees from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions and suits, including legal expenses, of whatsoever kind and nature, imposed on, incurred by or asserted against Lessor because of the manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of the Lease, *518 and the delivery, lease, possession, use, operation, condition or return of any Equipment * * * All the indemnities contained in any section of this Agreement including this Section 6, shall continue in full force and effect notwithstanding the expiration or other termination of this Lease and are expressly made for the benefit of, and shall be enforceable by, Lessor, its assigns and successors. [hereinafter Indemnification Provision (3)]
The lease payments were for 96 months at $ 33.98 each. As security for Montgomery-35's acquisition of the Questor Equipment, Montgomery-35 assigned its lease with Finalco to Finalco on August 21, 1973. 2. 1976 Equipment Transactions
a. NWB/Montgomery-35 1976 Transactions
On May 1, 1976, Montgomery-35 entered into five Purchase Agreements with Finalco for Honeywell data processing equipment (identified herein as "NWB #1" through "NWB #5" and referred to collectively as NWB/Montgomery-35 1976 equipment or transactions). [14] The purchase prices payable by Montgomery-35, by a cash downpayment and execution of a non-recourse installment note in each transaction, were as follows: Nonrecourse
Total Installment
Cash Transaction
Purchase Price
Note Downpayment
NWB #1
$ 51,340 $ 48,340
$ 3,000
NWB #2
8,640
7,440
1,200
NWB #3
35,915
34,415
1,500
NWB #4
2,150
2,000
150
NWB #5
2,150
1,825
325
100,195
94,020
6,175
*519 The equipment used in these transactions included the following: End-User
Type of Equipment
NWB #1
Honeywell Information Systems Equipment
NWB #2
Honeywell Information Systems Equipment
NWB #3
Honeywell Information Systems Equipment
NWB #4
ASR-33 Teleprinter Equipment
NWB #5
ASR-33 Teleprinter Equipment
In each of the NWB/Montgomery-35 1976 equipment Purchase Agreements, Finalco agreed that the Purchase Agreement, ancillary installment notes, and other documents would be null and void and that Finalco would return all moneys paid by Montgomery-35 if: (1) any security interest held by any other party was not released upon payment in full of the purchase price within one year; or, (2) if Finalco gave Montgomery-35 written notice that it did not intend to pay the full purchase price and obtain a release of such security interest.
In lieu of the required cash downpayments, Montgomery-35 executed *520 Non-Negotiable Promissory Notes in the NWB/Montgomery-35 1976 transactions as follows: Date of
Amount of
Date Note
Interest
Transaction
Note Note Paid Paid
NWB #1
6/1/76
$ 3,000
12/31/76
$ 140.00
NWB #2
5/1/76
1,200
12/31/76
64.00
NWB #3
5/1/76
1,500
12/31/76
80.00
NWB #4
6/1/76
150
12/31/76
8.00
NWB #5
6/1/76
325
12/31/76
15.17
The non-recourse installment notes executed by Montgomery-35 in each NWB/Montgomery-35 1976 transaction required the following payments: Number of Monthly
Amount of Each Transaction
Payments Monthly Payment
NWB #1
108
$ 625.16
NWB #2
108
96.22
NWB #3
108
445.07
NWB #4
108
25.86
NWB #5
108
23.60
In each of these transactions, Montgomery-35 and Finalco entered a Lease Agreement (whereby Montgomery-35 leased the equipment to Finalco) simultaneously with the purchase by Montgomery-35. Each of the Lease Agreements contained an Indemnification Provision. In these Lease Agreements, Finalco also was authorized to substitute or exchange equipment with similar equipment. On February 28, 1977, Montgomery-35 amended its NWB #4 transaction by substituting similar equipment. [15]
*521 The Leases for the NWB/Montgomery-35 1976 transaction required the following payments: Number of
Monthly
Amount of Each Transaction
Payments Monthly Payment
NWB #1
108
$ 658.49
NWB #2
108
100.22
NWB #3
108
463.41
NWB #4
108
32.00
NWB #5
108
24.68
As security for Montgomery-35's acquisition of the NWB/Montgomery-35 1976 equipment, Montgomery-35 assigned its leases with Finalco to Finalco. b. The Remaining 1976 Montgomery-35 Transactions
In addition to the five NWB/Montgomery-35 1976 equipment transactions described above, Montgomery-35 entered into the following four Purchase Agreements for equipment during 1976 (referred to collectively as the remaining 1976 Montgomery-35 transactions), acquiring the equipment from Finalco: Transaction
Date of Transaction
Borg Warner #1
[1] Apr. 26, 1976 Allegheny Ludlum
Industries
[2] May 26, 1976 Borg Warner #2
[1] May 28, 1976 Ford Motor Co.
[3] June 18, 1976 *522 The equipment used in these transactions included the following: End-User
Type of Equipment
Borg Warner #1
IBM 370-135 Central Processing Unit
Borg Warner #2
IBM 370-125 Central Processing Unit
and Peripheral Equipment
Ford Motor Co.
Honeywell Information Systems 66/10
Central Processing Unit
Allegheny Ludlum
Industries
IBM 370-135 Central Processor
The purchase prices, payable by cash downpayment and execution of a non-recourse installment note in each of the remaining 1976 Montgomery-35 transactions, were as follows: Nonrecourse
Total Installment
Cash Transaction
Purchase Price
Note Downpayment
Borg Warner #1
$ 415,000  $ 403,000  $ 12,000
Allegheny Ludlum
Industries 519,695
494,695
25,000
Borg Warner #2
286,316
276,316
10,000
Ford Motor Co.
550,144
530,144
20,000
1,771,155
1,704,155
67,000
In each of the remaining 1976 Montgomery-35 transactions Purchase Agreements, Finalco agreed that the Purchase Agreement, ancillary installment notes, and other documents would be null and void and that Finalco would return all moneys paid by Montgomery-35 if: (1) any security interest held by any other party was not released *523 upon payment in full of the purchase price within one year; or, (2) if Finalco gave Montgomery-35 written notice that it did not intend to pay the full purchase price and obtain a release of such security interest.
In lieu of the required cash downpayments, Montgomery-35 executed Non-Negotiable Promissory Notes in the remaining 1976 Montgomery-35 transactions as follows: Date of
Amount of
Transaction
Note Note Borg Warner #1
6/1/76
$ 12,000
Allegheny Ludlum
Industries 7/1/76
25,000
Borg Warner #2
6/1/76
10,000
Ford Motor Co.
7/1/76
20,000
The non-recourse installment notes executed by Montgomery-35 in each of the remaining 1976 Montgomery-35 transactions required the following payments: Number of Monthly
Amount of Each Transaction
Payments Monthly Payment
Borg Warner #1
96
$ 5,659.35
Allegheny Ludlum
Industries 96
6,947.03
Borg Warner #2
96
3,880.32
Ford Motor Co.
96
7,444.84
The installment note in the Ford Motor Co. transaction was amended on December 30, 1976. The only difference between the original and the amended installment notes was that the paragraph explicitly making the note non-recourse was stricken in *524 the amended installment note. In each of the remaining 1976 Montgomery-35 transactions, the Security Agreement executed on the same day as the other transaction documents reiterated that the installment note was non-recourse. No amendment of this provision of the Ford Motor Co. Security Agreement was made when the Amended Installment Note was executed. In each of the remaining 1976 Montgomery-35 transactions, Montgomery-35 and Finalco entered a Lease Agreement simultaneous with the purchases by Montgomery-35, whereby Montgomery-35 leased the equipment to Finalco. Each of these Lease Agreements contained an Indemnification Provision. In these lease agreements, Finalco was also authorized to substitute or exchange equipment with similar equipment. The Leases in each of the remaining 1976 Montgomery-35 transactions required the following payments: Number of Monthly
Amount of Each Transaction
Payments Monthly Payment
Borg Warner #1
96
$ 5,892.69
Allegheny Ludlum
Industries 96
7,230.36
Borg Warner #2
96
4,046.99
Ford Motor Co.
96
7,711.51
As security for Montgomery-35's acquisition of the remaining 1976 Montgomery-35 transactions, Montgomery-35 assigned *525 its leases with Finalco to Finalco. As of May 26, 1976, the Allegheny Ludlum Equipment was subject to a lease between Finalco and Allegheny Ludlum Industries (the Allegheny Ludlum User Lease) which provided for 84 monthly rental payments of $ 6,200 each. On May 28, 1978, Allegheny Ludlum Industries assigned its rights and obligations under the User Lease to Textron Inc. Finalco assigned the lease regarding the Allegheny Ludlum equipment to Society for Savings until its $ 295,015 promissory note of the same date was paid. The proceeds from the loan from Society for Savings evidenced by this note were to be used to purchase equipment Finalco intended to resell to Michigan Leasing and to Montgomery-35. 3. 1977 Equipment Transactions
During 1977, Montgomery-35 entered into the following three Purchase Agreements for equipment (referred to collectively as the 1977 Montgomery-35 transactions), purchasing the equipment from Finalco: Transaction
Date of Transaction
Standard Oil Co.
[1] Aug. 30, 1977 NWB #6
[2] June 30, 1977 NWB #7
[2] July 6, 1977 *526 The equipment used in these transactions included the following: End-User
Type of Equipment
Standard Oil Co.
IBM Magnetic Tape Drive Equipment
NWB #6
Honeywell Information Systems
Peripheral Equipment
NWB #7
Honeywell Information Systems
Peripheral Equipment
The purchase prices in each of these transactions, payable by cash downpayment and execution of a non-recourse installment note, were as follows: Nonrecourse
Total Installment
Cash
Transaction
Purchase Price
Note Downpayment
Standard Oil Co.
$ 1,923,870
$ 1,833,870
$ 90,000
NWB #6
114,282
112,282
2,000
NWB #7
139,176
136,676
2,500
In each of the 1977 Montgomery-35 transaction Purchase Agreements, Finalco agreed that the Purchase Agreement, ancillary installment notes, and other documents would be null and void and that Finalco would return all moneys paid by Montgomery-35 if: (1) any security interest held by any other party was not released upon payment in full of the purchase price within one year; or, (2) if Finalco gave Montgomery-35 written notice that it did not intend to pay the full purchase price and obtain a release of such security interest.
In lieu of the required *527 cash downpayments, Montgomery-35 executed Non-Negotiable Promissory Notes, representing the cash downpayment and interest accruing until the note due date, as follows: Date of
Amount of
Transaction
Note
Note
Standard Oil Co.
8/30/77
$ 104,400
NWB #6
6/30/77
2,320
NWB #7
7/6/77
2,900
The non-recourse installment notes executed by Montgomery-35 in each of these transactions required the following payments: Number of Monthly
Amount of Each
Transaction
Payments
Monthly Payment
Standard Oil Co.
96
$25,753.14
NWB #6
96
1,576.78
NWB #7
96
1,919.35
In each of the 1977 Montgomery-35 transactions, Montgomery-35 and Finalco entered a Lease Agreement simultaneously with the purchases by Montgomery-35, whereby Montgomery-35 leased the equipment to Finalco. Each of these Lease Agreements contains an Indemnification Provision. Finalco was also authorized by the Lease Agreements to substitute or exchange equipment with similar equipment. The Leases for the 1977 Montgomery-35 transactions required the following payments: Number of Monthly
Amount of Each
Transaction
Payments
Monthly Payment
Standard Oil Co.
96
$26,053.14
NWB #6
96
1,676.78
NWB #7
96
2,044.35
*528 Finally, as security for the 1977 Montgomery-35 transactions, Montgomery-35 assigned its leases with Finalco to Finalco. 4. 1978 Equipment Transactions
During 1978, Montgomery-35 entered into the following six Purchase Agreements (referred to collectively as the 1978 Montgomery-35 transactions), purchasing the equipment from Finalco: Transaction
Date of Transaction
Ford Motor Co. #2
[1] Jan. 1, 1978 Ford Motor Co. #3
[1] Jan. 1, 1978 Sprague Electric Co.
[2] July 2, 1978 Flexi-Van Corp.
[3] Aug. 1, 1978 Borg Warner #3
June 1, 1978
Reliance Electric
[4] Sept. 16, 1978 The equipment used in these transactions included the following: End-User
Type of Equipment
Ford Motor Co. #2
Certain Burroughs Corp. Equipment
Ford Motor Co. #3
Certain Burroughs Corp. Equipment
Sprague Electric Co.
IBM Magnetic Tape & Disk Drive
Flexi-Van Corp.
Honeywell Information Systems
6080 Central Processor
Borg Warner #3
IBM and INTEL Equipment
Reliance Electric
Storage Technology Peripheral
Equipment
*529 The purchase prices, payable by cash downpayment or exchange of equipment and execution of a non-recourse installment note in each of the 1978 Montgomery-35 transactions, were as follows: Nonrecourse
Total Installment
Cash Transaction
Purchase Price
Note
Downpayment
[1] Ford Motor Co. #2 $ 157,048 and  $157,048  None equipment
Ford Motor Co. #3 [1]
139,046 and  139,046
None equipment  [2] Sprague Electric Co. 110,185 and  110,185
None equipment  Flexi-Van Corp.
1,639,332
1,524,332
$115,000
Borg Warner #3
58,845   56,845
2,000
Reliance Electric
558,605  530,605
28,000
*530 In each of the 1978 Montgomery-35 Transaction Purchase Agreements, Finalco agreed that the Purchase Agreement, ancillary installment notes, and other documents would be null and void and that Finalco would return all moneys paid by Montgomery-35 if: (1) any security interest held by any other party was not released upon payment in full of the purchase price within one year; or, (2) if Finalco gave Montgomery-35 written notice that it did not intend to pay the full purchase price and obtain a release of such security interest.
In lieu of the required cash downpayments in the three remaining 1978 transactions, Montgomery-35 executed Non-Negotiable Promissory Notes, representing the cash downpayment and interest accruing until the note due date, as follows: Transaction
Date of Note
Amount of Note
Flexi-Van Corp.
Undated
$134,136.00
Borg Warner #3
Undated
2,332.80
Reliance Electric
Undated
32,659.20
In the Flexi-Van Corp. transaction, Montgomery-35 also executed a $ 115,000 Promissory Note and Security Agreement dated September 1, 1978. By Amendment dated June 1, 1982, Montgomery-35 modified the payment schedule of this note, delaying the payments due in *531 1982 and 1983. The non-recourse installment notes executed by Montgomery-35 for the 1978 Montgomery-35 transactions required the following payments: Number of Monthly
Amount of Each
Transaction
Payments
Monthly Payment
Ford Motor Co. #2
96
$2,205.43 Ford Motor Co. #3
96
1,952.63
Sprague Electric Co.
96
1,547.33
Flexi-Van Corp.
96
21,406.28
Borg Warner #3
96
798.25
Reliance Electric
96
7,451.32
In each of the 1978 Montgomery-35 transactions, Montgomery-35 and Finalco entered a Lease Agreement simultaneously with the Montgomery-35 purchases, whereby Montgomery-35 leased the equipment to Finalco. Each of these Lease Agreements contains an Indemnification Provision. In these Lease Agreements, Finalco was also authorized to exchange, or in some instances substitute, equipment with similar equipment. The Leases for the 1978 Montgomery-35 transactions required the following payments: Number of Monthly
Amount of Each
Transaction
Payments
Monthly Payment
Ford Motor Co. #2
96
$2,267.15
Ford Motor Co. #3
96
2,014.35
Sprague Electric Co.
96
1,630.47
Flexi-Van Corp.
96
22,604.20
Borg Warner #3
96
798.28
Reliance Electric
96
7,742.99
As security *532 for the 1978 Montgomery-35 transactions, Montgomery-35 assigned its leases with Finalco to Finalco. As of September 16, 1978, the Reliance Electric equipment was subject to a lease between Finalco and Reliance Electric Company. Under this lease, Reliance agreed to indemnify Finalco pursuant to Indemnification Provision (3). The Finalco-Reliance lease provided for 60 monthly rental payments of $ 8,443 each and a one year renewal term thereafter at a monthly rental of $ 6,365. C. BRAE PARTNERSHIP
The Brae partnership (hereinafter Brae) started business on July 2, 1979. Brae purchased numerous units of electronic data processing equipment for leasing at various locations. Brae was an investment vehicle to reward senior FG management. During the years in issue, Brae partnership interests were held as follows: Partner
Partnership Interest
Petitioner
20%
Olmstead
20%
Burnett
20%
Mutz
20%
Eastham
20%
Brae's U.S. Partnership Returns of Income for 1979 through 1984 reflect the following items: 1979
1980 1981
1982
Total income
$ 2,846 $ 139,219 $ 1,643,315 $ 3,177,328 Interest
deduction -0-
-0-
-0-
-0-
Depreciation
deduction 13,893 620,211 2,169,112 3,190,588 Ordinary
income (loss) (11,047)
(503,187)
(643,095)
(196,130)
*533 1983
1984
Total income
$ 4,150,749
$3,719,918
Interest
deduction 6
16,524
Depreciation
deduction 3,491,225
3,440,754
Ordinary
income (loss) 538,694
191,333
Brae's U.S. Partnership Returns of Income reflect the following investment interest expense passed through to its partners: Investment Interest
Petitioner's
Year
Expense
Share 1979
$ 11,045  $ 2,210  1980
41,712
8,343
1981
654,370
130,874
1982
1,277,580
255,516
1983
1,542,595
308,519
1984
1,262,860
252,572
The "Assets" portions of Brae's Schedules L to its U.S. Partnership Returns of Income for 1979 through 1984 reflect the following: 1979 1980 1981 1982 Cash
-0-
$ 4,394 $ 121,282 $ 54,918  Other investments
-0-
-0-
-0-
(24,293)
Depreciable assets
minus depreciation $180,612
6,388,240
10,725,221
12,773,323 1983
1984
Cash
$ 37,395  $ 21,162  Trade notes/
accounts receivable 1,743 -0-
Other investments
(21,655)
(7,492)
Depreciable assets
minus depreciation 9,060,616 5,619,862 The "Liabilities and Capital" portions of the Schedules L to the Brae's U.S. Partnership Returns of Income for 1979 through 1984 reflect *534 the following: 1979 1980 1981
1982
Accounts payable
-0-
$ 419,888  -0-
-0-
Nonrecourse loans
$179,955
6,269,492
$ 12,046,310 $ 15,271,984 Partners' capital
accounts 650
(296,746)
(1,199,807)
(2,468,036)
1983
1984
Mortgages, notes,
and bonds payable in less than 1 year $ 17,109  -0-
Nonrecourse loans
4,581,697
$ 2,553,090
Mortgages, notes,
and bonds payable in 1 year or more 7,990,286
7,706,883
Partners' capital
accounts (3,510,993)
(4,626,441)
Petitioner's K-1 for the Brae partnership for 1979 through 1984 reflects the following: Capital
Ordinary Account
Gain/Loss
1979
$ 131  ($ 2,209) 1980
(59,350)
(100,638)
1981
(239,962)
(128,619)
1982
(493,608)
(39,226)
1983
(702,199)
107,739 1984
(925,290)
38,266 The following adjustments relating to Brae were raised in the notice of deficiency and are in dispute: Net Investment
Year
Income/(Loss)
Interest Expense
1980
$ 85,693 $ 8,343  1981
153,158 108,229
1982
21,734 207,836
1983
(1,590)
199,438
1984
(5,883)
164,176
In addition, respondent's notice of deficiency allows petitioners $ 401 and $ 105 in investment credits *535 in 1981 and 1982, respectively, rather than the $ 21,054 and $ 3,739 claimed on their joint Federal income tax returns. 1. 1979 Equipment Transactions
On November 8, 1979, Finalco purchased computer equipment from Honeywell for a total purchase price of $ 194,505. Honeywell retained a security interest in the equipment until the purchase price was paid in full. Concurrent with this purchase, Finalco leased the Honeywell equipment to Northwestern Bell Telephone Company (hereinafter NWB/Brae 1979 equipment). NWB's obligations to make rental payments under the lease were "absolute and unconditional under all circumstances." This lease required $ 4,071 monthly rental payments for 60 months and provided for a 1-year renewal for monthly payments of $ 3,664. At the same time of its purchase, Finalco sold the NWB/Brae 1979 equipment to Brae for the same amount as it had paid for the NWB equipment, i.e., $ 194,505. Brae's purchase price was payable by a $ 11,700 full recourse promissory note and a $ 182,805 non-recourse installment note. Brae executed a $ 11,700 Promissory Note [16] and Security Agreement dated November 8, 1979, in connection with this purchase. The principal *536 and accrued interest was payable in 1987 entirely from residuals. This note was amended on December 21, 1981, requiring payments from September 1, 1982, through September 1, 1987. The sole signatory of the amendment was Eastham as a general partner of Brae. Brae's non-recourse installment note required monthly payments of $ 2,845.50. The Purchase Agreement between Brae and Finalco for the NWB/Brae 1979 equipment contained the following provisions: (9) Seller covenants to Buyer that Seller shall (i) fully pay (or cause to be paid) and perform any and all obligations, liabilities and indebtedness (collectively "Debts") secured by any liens (other than those arising by or through Buyer) against the Equipment ("Liens"), when due, and (ii) at such time as the Installment Note and the Equity Note (collectively, the "Notes") are paid in full, eliminate any and all such Liens. * * * *537 * (12) Seller hereby indemnifies Buyer and holds Buyer harmless from and against (i) any and all loss, cost, damage, injury or expense (including, without limitation, Court costs and reasonable attorneys' fees) whatsoever and howsoever arising which Buyer or any of its agents or employees may incur by reason of any breach by Seller of any of the covenants, warranties or representations by, or obligations of, Seller set forth in this Agreement and (ii) against any loss sustained or reasonable expense incurred by Buyer as the direct result of, or arising out of the imposition on the Equipment of any Federal or other tax lien or the foreclosure of such lien, by virtue of the failure to pay, or the underpayment by Seller of the Federal or other taxes payable by Seller hereunder, other than such taxes required to be paid by Buyer. [hereinafter Seller's Covenant and Indemnification Provisions]
On November 8, 1979, Brae leased the NWB/Brae 1979 equipment to Finalco. In the lease Finalco agreed to indemnify Brae, as contained in the Indemnification Provision. Finalco was also authorized by the lease to exchange or substitute equipment with similar equipment. This lease required *538 96 monthly payments of $ 2,845.50. However, there was no cash flow to Brae because the rental payments under the lease exactly equaled the principal and interest payments due under the installment note. As security for Brae's purchase of the NWB/Brae 1979 equipment, Brae assigned its lease with Finalco to Finalco. Also, on November 8, 1979, Brae and Finalco entered into a Remarketing Agreement concerning the NWB/Brae 1979 equipment. Concurrently, they entered into a Residual Sharing Agreement with respect to the NWB/Brae 1979 equipment, which provided that: 1. after the 60th month, Finalco and Brae would equally share, i.e. 50% each, rent received during the balance of the term of the owner lease which ran for 96 months; and 2. Brae would receive 100% of the rents or sale proceeds after the expiration of the original lease until it had received cumulative cash distributions equal to 120% of its net equity and, thereafter, would receive 80% of such rents or sale proceeds.
Brae's net equity is defined as its cash downpayment less all cash-flow distributions to Brae respecting the NWB/Brae 1979 equipment. On August 28, 1980, Finalco assigned a security interest in the *539 NWB/Brae 1979 equipment and lease to NSCC as security for its $ 158,000 promissory note of the same date. 2. 1980 Equipment Transactions
During 1980, Brae entered into the following seven Purchase Agreements for data processing and trucking equipment (referred to collectively as the 1980 Brae transactions), purchasing the equipment from Finalco: Transaction
Date of Transaction
Keebler Company
Aug. 1, 1980
United Technologies #1
Aug. 10, 1980
Jefferson Stores #1
Oct. 15, 1980
Pacific Telephone
Nov. 4, 1980
Leigh Products, Inc.
Dec. 23, 1980
Inland Steel
Dec. 26, 1980
Jefferson Stores #2
Dec. 28, 1980
The equipment used in these transactions included the following: End-User
Type of Equipment
Keebler Company
Burrough & Northern Telecom Equipment
United Technologies #1
IBM Memory Storage Equipment
Jefferson Stores #1
Truck Equipment
Pacific Telephone
Burroughs Equipment
Leigh Products, Inc.
Prime Computer Equipment
Inland Steel
IBM 3350 Disk Drive & Related Equipment
Jefferson Stores #2
Certain Trucking Equipment
Each of the 1980 Brae transaction Purchase Agreements contained Seller's Covenant and Indemnification Provisions. The purchase prices for the 1980 *540 Brae transactions were payable by execution of an equity note and a non-recourse installment note as follows: Nonrecourse
Total Installment
Equity Transaction
Purchase Price
Note Note Keebler Company
$ 151,022
$ 145,022  $ 6,000  United Technologies #1
170,420
163,420
7,000
Jefferson Stores #1
1,279,646
1,241,646
38,000
Pacific Telephone
2,779,692
2,679,692
100,000
[1] Leigh Products, Inc. 267,500
254,100
13,400
Inland Steel
1,215,620
1,154,820
60,800
Jefferson Stores #2
565,346
543,046
22,300
Total  6,429,246 6,181,746 247,500 The non-recourse installment notes executed by Brae in each of the 1980 Brae transactions required monthly payments in the following amounts: Amount of Each Transaction
Monthly Payment
Keebler Company
$ 2,333.68 United Technologies #1
2,629.74
Jefferson Stores #1
19,980.47
Pacific Telephone
37,631.07
Leigh Products, Inc.
7,168.51
Inland Steel
17,378.61
Jefferson Stores #2
7,100.90
*541 In each of the 1980 Brae transactions, Brae and Finalco entered into a Lease Agreement simultaneously with the purchases by Brae, whereby Brae leased the equipment to Finalco. Each of these Lease Agreements contained an Indemnification Provision. Under the lease agreements, Finalco was authorized to exchange or substitute equipment with similar equipment. [17]
The Leases for the 1980 Brae transactions required the following payments: Number of Monthly
Amount of Each Transaction
Payments Monthly Payment
Keebler Company
96
$ 2,333.68 United Technologies #1
96
2,629.74
Jefferson Stores #1
96
19,980.47
Pacific Telephone
96
37,631.07
Leigh Products, Inc.
41
7,168.46
Inland Steel
96
17,378.61
Jefferson Stores #2
96
7,100.90
As security for the 1980 Brae transactions, *542 Brae assigned its leases with Finalco to Finalco. There was no cash-flow to Brae because the rental payments under the Finalco leases exactly equaled the principal and interest payments due under the installment notes. Brae and Finalco also entered into Remarketing Agreements concerning the 1980 Brae Equipment. In each of these agreements, Brae agreed to pay Finalco 10 percent of the net proceeds generated from Finalco's remarketing services. In addition, Brae and Finalco entered into Residual Sharing Agreements with respect to the 1980 Brae equipment. These Agreements provided that Finalco and Brae would, after a designated period, equally share rents received during the balance of the term of the end-user lease and, thereafter, Brae would receive 100 percent of the rents or sale proceeds until it had received cumulative cash distributions equal to 120 percent of its net equity [18] and, thereafter, 80 percent of such rent or sale proceeds. *543 a. Keebler Company Equipment
As of April 22, 1980 (prior to Brae's purchase of the Keebler Company equipment from Finalco), the Keebler Company equipment was subject to a lease between Finalco and Keebler Company. Under this lease Keebler Company agreed to indemnify Finalco pursuant to Indemnification Provision (3). The Finalco-Keebler lease provided for 56 monthly rental payments of $ 3,019 and a 90-day renewal term thereafter at a monthly rental of $ 2,566.15. On November 18, 1980, Finalco assigned its lease with Keebler Company to Manufacturers Bank as security for Finalco's $ 126,218.74 non-recourse promissory note of the same date. On August 1, 1980, petitioner executed an Agreement of Assumption whereby he was to assume personal liability for $ 6,300 of Finalco's $ 126,218.74 non-recourse obligation dated November 18, 1980, to Manufacturers Bank secured by the Keebler Company equipment. [19] The Agreement of Assumption was signed only by petitioner. The signature block for acceptance by the lender is blank. *544 On the same day, petitioner executed a second Agreement of Assumption whereby he was to assume personal liability for $ 9,986 of Finalco's $ 126,218.74 non-recourse obligation dated November 18, 1980, to Manufacturers Bank secured by the Keebler Company equipment. [20] This Agreement of Assumption was signed as accepted by lender but does not indicate when it was signed on the lender's behalf. On November 18, 1980, Brae granted Manufacturers Bank a security interest in the Keebler equipment and all proceeds from that equipment to secure Finalco's obligations to Manufacturers Bank. The letter granting the security interest was signed as agreed and accepted on behalf of Manufacturers Bank. The letter agreement provided: The Lender [Manufacturers Bank] agrees that the Owner [Brae] has no liability whatsoever for payment of the Note or satisfaction of Finalco's *545 obligations thereunder or under the Security Agreement or for any deficiency judgment of any foreclosure of the Lender's security interests in the Equipment and the Equipment Schedule or for any other obligations of Finalco to the Lender.
The letter agreement further stated that Gateway Aviation Holdings, Ltd., purchased the Keebler equipment from Finalco and sold that equipment to Brae. This representation is inconsistent with the Purchase Agreement between Finalco and Brae and the other transaction documents received in evidence. b. United Technologies #1 Equipment
Prior to Brae's purchase of the United Technologies #1 equipment from Finalco, Finalco had purchased the equipment from United Technologies on July 7, 1980, for $ 70,401, and leased the equipment back to United Technologies for 35 months at $ 5,186 per month. The lease could be renewed thereafter for 3 months at a monthly rental of $ 4,670. On September 10, 1980, Finalco assigned its lease with United Technologies #1 to NSCC as security for Finalco's $ 145,149.44 promissory note of the same date. On the same day it purchased the United Technologies #1 equipment (August 10, 1980), Brae assigned its lease *546 with Finalco to NSCC as security for Finalco's promissory note to NSCC. c. Jefferson Stores #1 Equipment
As of April 28, 1980 (prior to Brae's purchase of the Jefferson Stores #1 equipment), the Jefferson Stores #1 equipment was subject to a lease between Finalco Fleet Services Incorporated and Jefferson Stores, Inc. The Finalco-Jefferson Stores lease provided for varying lease terms and monthly rentals. If Jefferson Stores, Inc., chose to terminate the lease after a specified period, it was required to pay Finalco Fleet Services, Inc. the costs of selling the equipment plus the difference between the sales proceeds and the applicable termination value. This provision essentially ensured that Finalco Fleet Services, Inc. would not suffer a loss if Jefferson Stores terminated the lease. The record contains no evidence concerning how, or if, Finalco acquired Finalco Fleet Services, Inc.'s interest in the Jefferson Stores #1 equipment. On October 7, 1980, Finalco assigned a security interest in all of its rights in the Jefferson Stores #1 lease to PSFS as security for its October 7, 1980, $ 614,558.77 promissory note. In lieu of the October 7, 1980 note, Finalco executed *547 a $ 754,718.56 note on October 14, 1980, which was secured by the Jefferson Stores #1 lease. d. Pacific Telephone Equipment
As of June 15, 1980 (prior to Brae's purchase of the equipment from Finalco), the Pacific Telephone equipment was subject to a lease between Utilities Leasing and Pacific Telephone and Telegraph Company. The record does not reflect when, or the terms on which, Finalco acquired an interest in the Pacific Telephone equipment. On November 10, 1988, Utilities Leasing assigned its rights under the Pacific Telephone equipment lease to Finalco. By Agreement of Assumption dated November 4, 1980, petitioner assumed on a full recourse basis $ 187,922 of Utilities Leasing's $ 7,490,671.99 obligation to PSFS. This assumption was accepted on behalf of Utilities Leasing and PSFS. Identical Agreements of Assumption were executed by Olmstead, Burnett, Eastham and Mutz. The assumption agreements do not indicate whether these assumptions were made as officers, shareholders, or directors of FG or Finalco, or as Brae partners. e. Inland Steel Equipment
As of February 1, 1979 (prior to Brae's purchase of the equipment from Finalco), the Inland Steel equipment *548 was leased by Meridian to Inland Steel Company. This lease provided that Meridian "shall not be liable to Lessee or any other person for any claim or expense related directly or indirectly to the Equipment unless arising out of negligent acts of Lessor." On June 1, 1981, approximately 6 months after Finalco's sale of the equipment to Brae, Meridian and Inland Steel amended the terms of the lease. Finalco purchased the Inland Steel equipment from Meridian on December 24, 1980. Finalco executed two non-recourse promissory notes of $ 22,427.90 and $ 45,818.44 in connection with this purchase. Simultaneously, Meridian assigned its lease of the Inland Steel equipment to Finalco. The assignment expressly provided that Finalco was not assuming any obligations of Meridian under its February 26, 1979, $ 881,128.42 non-recourse note to Suburban Trust & Savings Bank. f. Jefferson Stores #2 Equipment
As of October 1, 1980 (prior to Brae's purchase of the equipment from Finalco), the Jefferson Stores #2 equipment was subject to a lease between Finalco Fleet Services, Inc. and Jefferson Stores, Inc. The record contains no evidence concerning how, or if, Finalco acquired Finalco Fleet *549 Services, Inc.'s interest in the Jefferson Stores #2 equipment. On February 11, 1981, Finalco assigned a security interest in all of its rights in the Jefferson Stores #2 lease to PSFS as security for its February 11, 1981, $ 694,046.76 non-recourse promissory note and its March 12, 1981, $ 141,336.34 non-recourse promissory note. Each of Finalco's non-recourse promissory notes provided that: Any provision in this Note to the contrary notwithstanding, no recourse shall be had for the payment of the principal of or any interest or any other sums payable on this Note against Finalco personally or any incorporator, shareholder, officer or director of Finalco.
In this assignment, Finalco warranted and represented that it had not assigned or pledged, and would not assign or pledge, any of its rights in the Jefferson Stores #2 equipment lease. g. Leigh Products, Inc. Equipment
Finalco purchased the Leigh Products, Inc. equipment from Prime Computer on the same day it sold the equipment to Brae (December 23, 1980). As of October 31, 1980, the Leigh Products, Inc. equipment was subject to a lease between Finalco and Leigh Products, Inc. This lease provided for 45 monthly *550 rental payments of $ 11,954. Pursuant to a $ 328,035.93 non-recourse promissory note, dated July 30, 1981, Finalco assigned its interest in the Leigh Products, Inc. end-user lease, the lease between Brae and Finalco relating to the Leigh Products, Inc. equipment, and Brae's $ 254,100 non-recourse note to Muskegon Bank & Trust Company. h. International Harvester Equipment
In addition to sales of equipment to Brae during 1980, Finalco also assigned its interest in two International Harvester equipment transactions to Brae in that year. In the International Harvester #1 transaction, Brae executed a $ 102,549.35 non-recourse promissory note dated December 1, 1980; in the International Harvester #2 transaction, Brae executed a $ 232,260.63 non-recourse promissory note dated January 1, 1981. As of May 23, 1977, the International Harvester #1 equipment was leased by Finalco to International Harvester. As of November 30, 1980, Finalco assigned its interest in this lease to Brae. As of December 18, 1980, the International Harvester #2 equipment was subject to a lease between Finalco and International Harvester. Under this lease International Harvester agreed to indemnify Finalco *551 pursuant to Indemnification Provision (3). On December 19, 1980, Finalco assigned this lease to Brae. 3. 1981 Equipment Transactions
a. International Harvester #3 and #4 Transactions
During 1981, Finalco assigned its interest in two International Harvester equipment transactions to Brae. In the International Harvester #3 transaction, Brae executed a non-recourse promissory note dated April 1, 1981, in the principal amount of $ 26,305.54, [21] payable, in part, in 39 monthly installments of $ 894 and a non-recourse promissory note dated April 1, 1981, in the principal amount of $ 62,903.27, payable, in part, in 39 monthly installments of $ 2,140. In the International Harvester #4 transaction, Brae executed a non-recourse promissory note dated May 1, 1981, in the principal amount of $ 172,815.60 payable, in part, in 39 monthly installments of $ 11,647.69. *552 As of December 18, 1980, the International Harvester #3 and #4 equipment was leased by Finalco to International Harvester. Under this lease, International Harvester agreed to indemnify Finalco pursuant to Indemnification Provision (3). This lease specified two sets of rental payments: (1) 38 installments of $ 2,373 followed by 3 installments of $ 2,140 and, (2) 38 installments of $ 1,127 followed by 3 installments of $ 894. As of March 15, 1981, Finalco assigned its interest in this lease to Brae. b. Finalco Leases #1-#4 Transactions
During 1981, Brae purchased various items, including a telephone system, an ice maker, dishwasher, refrigerator, air conditioners, exhaust fans, chairs, sofas, tables, desks, bookcases, Prime data processing equipment, and photocopy equipment, which it leased to Finalco (referred to collectively as the 1981 Finalco Lease transactions). The purchase prices of this equipment were as follows: Transaction
Purchase Price
Finalco Lease #1
$ 171,570.00
Finalco Lease #2
304,485.26
Finalco Lease #3
285,403.63
Finalco Lease #4
45,433.06
In each of the 1981 Finalco Lease transactions, with the exception of the Prime computer, the leased *553 equipment or other items were installed in or located at Finalco's corporate offices in McLean, Virginia. During 1981, Finalco was moving to new offices. Leasing the equipment necessary in the new offices from Brae was a mechanism to provide the owners of Finalco with "a nice rate of return." The 1981 Finalco Lease transactions were set up to insure that the lease payments required from Finalco exceeded Brae's purchase price for the equipment. Consequently, residual values on this equipment were ignored. Each of the 1981 Finalco Lease Agreements provided: 14. INDEMNITY. Lessee shall, and does hereby, indemnify and save Lessor [Brae] harmless from any and all losses and/or liability, including, but not limited to STRICT LIABILITY IN TORT, for funds advanced to Supplier, and for taxes, costs and expenses, including reasonable attorneys' fees, arising out of the purchase, ownership, location, installation, possession, leasing, renting, operation, control, use, maintenance, repair, delivery and/or return of the equipment. Lessee shall be credited with any proceeds received by Lessor from insurance policies paid for or obtained by Lessee. The obligations of Lessee under this *554 paragraph shall survive for a period of three (3) years from the date of the expiration of the lease term or from the date of termination or rescission of this agreement, whichever is later in time. [hereinafter Indemnification Provision (4)]
The Leases for the 1981 Finalco Lease transactions required the following payments: Number of Monthly
Amount of Each Transaction
Payments Monthly Payment
Finalco Lease #1
59
$ 4,697.43 Finalco Lease #2
59
8,173.77
Finalco Lease #3
29
14,705.51
Finalco Lease #4
29
2,325.00
Brae executed two demand promissory notes payable to Firstmark Leasing Corporation (Firstmark), one dated July 27, 1981, in the amount of $ 79,022, and one dated August 10, 1981, in the amount of $ 39,391, in connection with the purchase of the Finalco Lease #1 equipment. As security for its promissory notes, Brae assigned the Finalco Lease #1 equipment and its lease with Finalco to Firstmark. Brae also assigned the Finalco Leases #2, #3, and #4 equipment and its leases with Finalco to Firstmark. On August 20, 1981, Finalco guaranteed to Brae the payment of all rents due under its lease with Brae of the Finalco Lease #3 equipment. This guarantee *555 was signed on Finalco's behalf by petitioner and Eastham. c. J.C. Penney Equipment
On December 10, 1980, DPF Asset Management Corp. (DPF) executed a $ 1,848,600 non-recourse promissory note to the First National State Bank of New Jersey (First National) in connection with its purchase of equipment leased to J.C. Penney Company. In connection with this loan, DPF also executed a Nonrecourse Assignment and Security Agreement to First National, assigning the J.C. Penney equipment and lease as security for its non-recourse promissory note. Pursuant to a Purchase Agreement, dated as of December 1, 1981, Brae purchased certain IBM electronic data processing equipment from DPF for $ 2,715,860. At the time of the purchase, the equipment was leased to J.C. Penney Company (the J.C. Penney Equipment). Brae's purchase from DPF was subject and subordinate to preexisting liens of financial institutions, liens in favor of DPF's predecessor in interest, and existing and future underlying leases. Brae's purchase price for the J.C. Penney Equipment was payable by execution of a $ 164,212 recourse promissory note and a $ 2,551,648 non-recourse promissory note. Brae's recourse promissory *556 note was secured by a security interest in the J.C. Penney equipment. Brae's non-recourse note was secured by a security agreement and assumption of DPF's existing $ 1,505,009.57 non-recourse debt. The security agreement provided that all lease payments would be made to DPF until its non-recourse note was paid. Brae's assumption of DPF's $ 1,505,009.57 preexisting non-recourse debt was stated as being on "a full recourse basis" and further stated that each partner "shall not be jointly and severally liable for more than one-fifth (1/5) of the Assumed Amount." Although signed by each of the Brae partners, the Agreement of Assumption was not signed on behalf of the lender. As of December 1, 1981, Brae leased the J.C. Penney equipment to DPF. The fixed rent required under this lease was 60 monthly installments of $ 53,766.92. The fixed rent payable under this lease was reduced by the $ 53,766.92 monthly payments due under Brae's nonrecourse note to DPF. However, there was no guaranteed cash-flow to Brae because the stated rental payments under the DPF lease exactly equaled the principal and interest payments due under Brae's Installment Note. Finally, Brae entered into remarketing *557 agreements with DPF concerning the J.C. Penney equipment. d. The TPA Equipment
On December 14, 1981, TPA Leasing, a Division of Tax Planning Associates, Inc. (TPA), purchased data processing equipment (the TPA equipment) from Finalco for $ 430,122. TPA's purchase price was payable with a $ 20,650 recourse promissory note and a $ 409,472 full recourse installment promissory note. In the purchase agreement, Finalco, as Seller, covenanted as follows: 3.2 Discharge of Lien. Seller shall (i) fully pay and perform any and all of Seller's recourse obligations under the Lien when due and (ii) not materially modify the terms of the Lien in any way to extend or in any way alter its payment terms except as permitted under Section 4.1 hereof.
Finalco further agreed to indemnify TPA pursuant to Indemnification Provision (2). Finalco's obligation to indemnify TPA was reiterated in a letter of indemnification signed on the same date as the purchase agreement between Finalco and TPA. Finalco's obligations to TPA were subsequently assigned, with Finalco's explicit agreement, to Brae. Finalco had purchased the TPA equipment with funds it had borrowed on a non-recourse *558 basis from Manufacturers Bank. At the time of the sale to TPA, the TPA equipment was subject to leases between Finalco and various end-users. The TPA equipment and leases were assigned to the lender as security for Finalco's non-recourse notes. Finalco's loan from Manufacturers Bank was repayable entirely out of the rental proceeds of the existing end user leases. Pursuant to a Purchase Agreement, dated December 14, 1981, Brae purchased the TPA equipment from TPA for a total purchase price of $ 431,172. In the Purchase Agreement, TPA covenanted to insure Finalco's payment of its obligations in regard to the TPA equipment as follows: 3.2 Discharge of Lien. Seller shall cause Finalco to (i) fully pay and perform any and all of Finalco's obligations under the Lien when due and (ii) not materially modify the terms of the Lien in any way to extend or in any way alter its payment terms except as permitted under Section 4.1 hereof.
TPA agreed to indemnify Brae as stated in the Indemnification Provision (2). Brae's purchase price for the TPA Equipment was payable by execution of a $ 21,700 recourse promissory note and a $ 409,472 limited recourse installment note. The *559 specified amount of recourse obligation on the limited recourse installment note was $ 250,217. On the same day it purchased the TPA equipment, Brae leased it to Finalco. Brae agreed that, so long as the underlying end-user lease was not declared in default by the lender pursuant to the bank lien, Finalco would be deemed to have made all payments and satisfied all obligations under this lease. Thus, there was no cash-flow to Brae because the rental payments under the Finalco lease exactly equaled the principal and interest payments due under Brae's installment note. Finalco agreed to indemnify Brae as follows: 17. Indemnification. 17.1 Lessee [Finalco] will indemnify Lessor [Brae] and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including without limitation, reasonable attorney's fees, wheresoever and howsoever arising which Lessor or its subsidiaries or stockholders, or any of its, or their, directors, officers, agents, employees, stockholders or partners, may incur by reason of any material breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease * * *
Brae *560 assigned its lease with Finalco to TPA as security for payment of its limited recourse promissory note. e. The Polk Equipment
On December 2, 1981, Finalco purchased certain IBM 3033-U8 central processing unit equipment (the Polk Equipment) from Charter Financial Corporation (Charter) for $ 2,313,000. The purchase price was payable as follows: Cash due on Dec. 2, 1981
$ 115,000  Cash due on Apr. 1, 1982
30,000
Cash due on Aug. 1, 1982
70,000
Non-recourse promissory note
[1] 821,102
Assumption of existing lien
1,276,898
Charter warranted that the existing lien would be fully amortized through payments made pursuant to the existing end-user lease. Charter was granted a first right of refusal to remarket each item of equipment through November 30, 1988. Prior to Finalco's purchase of the Polk Equipment, Charter had leased the Polk *561 equipment to R.L. Polk & Company by lease dated June 15, 1981 (the Charter lease). This lease was assigned to Finalco when it purchased the Polk equipment. On the same day it purchased the Polk equipment, Finalco sold it to Brae. The purchase price to Brae was $ 2,313,000, payable by execution of a $ 116,00 recourse promissory note and a $ 2,313,000 non-recourse installment note. The purchase agreement between Brae and Finalco contained Seller's Covenant and Indemnification Provisions. As security for payment of its non-recourse installment note, Brae granted Finalco a security interest in the Polk equipment and its rights under its lease with Finalco. Finalco also assigned the Charter lease to Brae when Brae purchased the Polk Equipment. On the same day it purchased the Polk equipment from Finalco, Brae leased the Polk equipment back to Finalco. In this lease Finalco agreed to indemnify Brae pursuant to the Indemnification Provision. In the lease Finalco was also authorized to exchange or substitute equipment subject to this lease. The lease provided for 96 monthly installments of $ 35,353.95. However, there was no cash-flow to Brae because the rental payments under the *562 Finalco lease exactly equaled the principal and interest payments due under Brae's installment note. Finally, Finalco and Brae entered form Remarketing and Residual Sharing Agreements concerning the Polk equipment. 4. 1982 Equipment Transactions
a. Warner-Lambert, Credit Bureau, and American/Revere
(1) TPA and Brae's 1982 Equipment Purchases
On June 15, 1982, TPA entered into three Purchase Agreements with Finalco, purchasing the Warner-Lambert equipment, the Credit Bureau equipment, and the American/Revere Equipment (referred to collectively as the 1982 TPA/Brae equipment) from Finalco. On the same day, TPA entered into agreements selling the 1982 TPA/Brae equipment to Brae. TPA's purchase price for the 1982 TPA/Brae equipment was as follows: Total
Recourse
Recourse Purchase
Promissory
Installment
Transaction
Price
Note
Note Warner-Lambert
$ 242,393  $ 11,593
$ 230,800  Credit Bureau
838,261
39,900
798,361
American/Revere
208,200
10,000
198,200
1,288,854
61,493
1,227,361
The equipment used in these transactions included the following: End-User
Type of Equipment
Warner-Lambert
IBM 3880 Equipment
Credit Bureau
Amdahl 470 V.6 II Central
Processing Unit
American Revere
IBM Electronic Data Processing
Equipment
*563 In each Purchase Agreement, Finalco covenanted as follows: 3.2 Discharge of Lien. Seller [Finalco] shall (i) fully pay and perform any and all of Seller's recourse obligations under the Lien when due and (ii) not materially modify the terms of the Lien in any way to extend or in any way alter its payment terms except as permitted under Section 4.1 hereof. [hereinafter Discharge of Lien]
Finalco further agreed to indemnify TPA as stated in Indemnification Provision (2). Finalco's obligation to indemnify TPA was reiterated in a letter of indemnification signed on the same date as the Purchase Agreement between Finalco and TPA. Brae's purchase price for the 1982 TPA/Brae equipment was as follows: Limited
Total
Recourse
Recourse
Purchase
Promissory
Installment
Transaction
Price
Note
Note
Warner-Lambert
$ 243,000  $ 12,200 $ 230,800  Credit Bureau
840,361
[1] 42,000
798,361
American/Revere
208,700
10,500
198,200
1,292,061
64,700
1,227,361
*564 In each 1982 TPA/Brae equipment Purchase Agreement, TPA covenanted to insure Finalco's payment of its obligations in regard to the 1982 TPA/Brae equipment as stated in the Discharge of Lien. TPA also agreed to indemnify Brae as stated in Indemnification Provision (2). In each of the 1982 TPA/Brae transactions, the specified portion of the limited recourse note which was recourse was as follows: Total Amount of
Amount of Transaction
Limited Recourse Note
Recourse Liability
Warner-Lambert
$ 230,800
$ 66,149 Credit Bureau
798,361
228,816
American/Revere
198,200
90,438 On the day it purchased the 1982 TPA/Brae equipment, Brae leased it to Finalco. Brae assigned its lease with Finalco to TPA as security for payment of its limited recourse promissory note. There was no cash-flow to Brae because the rental payments under the Finalco leases exactly equaled the principal and interest payments due under Brae's installment note. (2) Blackwood's Equipment Purchase
On September 30, 1980, Blackwood purchased the Warner-Lambert equipment from Comdisco for $ 2,676,182, payable by cash paid at closing in the amount of $ 135,447, two promissory notes each in the *565 amount of $ 67,724, payable September 1, 1981, and September 1, 1982, respectively, and discounted lease rentals of $ 2,405,286.97. Comdisco warranted that the $ 2,405,286.97 debt assumed by Blackwood would be fully paid by lease rents. In addition to the consideration specified above, Blackwood agreed in the purchase agreement to enter into a Management and Remarketing Agreement with Comdisco. At the time of Blackwood's purchase, the Warner-Lambert equipment was subject to a lease, dated December 29, 1979, between Comdisco and Warner-Lambert. The record does not reflect how, or when, Finalco acquired the Warner-Lambert equipment from Blackwood. Contrary to the Blackwood/Comdisco Purchase Agreement, a June 15, 1982, letter of Brae to Comdisco stated that Finalco purchased the Warner-Lambert equipment from Comdisco on June 15, 1982. On September 30, 1981, Blackwood purchased the Credit Bureau equipment from Comdisco [22] for $ 3,537,563, payable by three promissory notes, each in the amount of $ 129,710.67, payable December 30, 1981, September 30, 1982 and September 30, 1983, respectively, and discounted lease rentals of $ 3,160,868.39. Comdisco warranted that the $ 3,160,868.39 *566 debt assumed by Blackwood would be fully paid by lease rents. In addition to the consideration specified above, Blackwood agreed in the purchase agreement to enter into a Management and Remarketing Agreement with Comdisco. The record does not reflect how, or when, Finalco acquired the Credit Bureau equipment from Blackwood. Contrary to the Blackwood/Comdisco Purchase Agreement, a June 15, 1982, letter of Brae to Comdisco stated that Finalco purchased the Credit Bureau equipment from Comdisco on June 15, 1982. (3) Finalco and Revere Copper and Brass Inc. Lease
At the time of TPA's purchase of the American/Revere equipment, the Revere equipment was subject to a lease, dated September 24, 1981, whereby Finalco leased the equipment to Revere Copper and Brass Inc. After TPA's purchase of the American/Revere equipment, Finalco leased the American *567 equipment to American Hoeschst. After the seriatim sales to TPA and Brae, Finalco assigned the American/Revere leases to First National Bank of Allentown as security for Finalco's non-recourse loans from that bank. These assignments were agreed to and accepted by First National Bank of Allentown. On September 20, 1982, the American equipment was retroactively deleted from TPA's and Brae's June 15, 1982, purchases. The transaction documents were amended to reduce TPA's purchase price for only the Revere equipment to $ 123,122, and Brae's purchase price for the same equipment to $ 123,622. Finalco's lease payments were also reduced. b. NWB/Brae #2 Equipment
As of November 5, 1982, Finalco purchased data processing equipment, including the NWB/Brae #2 equipment. In order to make this purchase, Finalco executed a $ 3,021,959 non-recourse note dated December 30, 1982, and a $ 3,780,810 note to PSFS dated February 2, 1983. Finalco's non-recourse note provided that it was payable solely out of the income and/or proceeds from the NWB/Brae #2 equipment and that no holder of the note "shall have recourse to the Maker [Finalco] personally or against any incorporator, shareholder, *568 officer or director" of Finalco. By lease dated September 24, 1982, Finalco leased the NWB/Brae #2 equipment to Northwestern Bell Telephone Company. This lease required 84 monthly rental payments of $ 118,611. This equipment and the lease were assigned to PSFS to secure Finalco's acquisition debt. The lessee was directed to make lease payments directly to PSFS. On December 30, 1982, Brae purchased the NWB/Brae #2 equipment from Finalco for $ 3,780,810. The stated purchase price consisted of a $ 113,424 payment to Finalco and assumption of $ 3,667,386 of Finalco's non-recourse debt to PSFS on a partial recourse basis. By Assignment and Assumption Agreement dated as of December 30, 1982, Brae assumed Finalco's obligations under the Note and Security Agreement with PSFS on the same terms which Finalco had, except that its obligation was recourse. Each Brae partner was to assume liability of $ 604,391.80. PSFS consented to this assumption. c. United Technologies #2 and Allegheny
By lease dated December 12, 1980, Finalco leased the United Technologies #2 equipment to United Technologies Corporation. This lease required 48 monthly rental payments of $ 54,399. The lease *569 provided that, following the original lease term, the equipment could be leased for 6 months at $ 48,959 per month and, thereafter, for 12 months at $ 43,519. This lease was assigned by Finalco to Lincoln First Bank as security for Finalco's $ 1,941,989.98 promissory note, dated March 23, 1981. By lease dated August 12, 1982, Finalco leased the Allegheny equipment to Allegheny International, Inc. This lease required 29 monthly rental payments of $ 2,200. This lease was assigned by Finalco to Manufacturers Bank as security for Finalco's $ 49,076.37 non-recourse promissory note dated October 20, 1982. On November 1, 1982, Brae purchased the United Technologies #2 and Allegheny equipment (IBM 3880 and 4850 data streaming equipment) from Finalco for $ 53,615. The stated purchase price consisted of a $ 2,700 recourse equity note and a $ 50,915 non-recourse installment note. The Purchase Agreement between Brae and Finalco contained a Seller's Covenant and Indemnification Provision. Simultaneously, Brae executed a $ 2,600 Promissory Note and Security Agreement to Finalco in connection with its purchase of the Allegheny equipment. [23] The first payment on this note was not due until *570 July 1, 1984. Also, on November 1, 1982, Brae leased the United Technologies and Allegheny equipment back to Finalco. In this lease Finalco agreed to indemnify Brae, as contained in the Indemnification Provision. There was no cash-flow to Brae, however, because the rental payments under the Finalco Lease exactly equaled the principal and interest payments due under Brae's installment note. As security for its installment note, Brae assigned its interest in the United Technologies and Allegheny equipment, and all rentals due under its lease to Finalco for such equipment, to Finalco. d. Finalco Leases #5 and #6
During 1982, Brae purchased various items including flashphones, a paper feeder and printer, tables, chairs, bookcases, files, cabinets, fabric panels, and brass plaques, which it leased to Finalco. These transactions (referred to collectively as the 1982 Finalco Lease transactions) had *571 the following purchase prices: Transaction Purchase Price
[1] Finalco Lease #5 $ 82,947.67 Finalco Lease #6
122,212.22
Total
205,159.89
The equipment or other items were installed in or located at Finalco's corporate offices in McLean, Virginia. The leases required the following payments: Number of Monthly
Amount of Each Transaction
Payments Monthly Payment
Finalco Lease #5
29
$ 3,700
Finalco Lease #6
29
5,250
Brae executed a $ 81,650.18 demand promissory note payable to Firstmark dated March 1, 1982, in connection with the purchase of the Finalco Lease #5 equipment. This note was payable by 27 monthly payments of $ 3,700. As security for its promissory notes, Brae assigned the Finalco Lease #5 equipment, and its lease with Finalco, to Firstmark. Brae executed a $ 107,693.71 demand promissory note payable to Firstmark dated October 1, 1982, in connection with the purchase of the Finalco Lease #6 equipment. This note was payable by 25 monthly payments of $ 5,250. FG guaranteed the repayment of this note. Beginning in June 1984, the lease of certain of the Finalco #5 equipment *572 was renewed by Finalco for 32 months beginning in June 1984, at a monthly rate of $ 1,203. Brae agreed to sell this equipment to Finalco for $ 1 at the end of that renewal period. Petitioner signed this renewal on behalf of both Brae and Finalco. Also, beginning in December 1984, the lease of certain of the Finalco #6 equipment was renewed by Finalco for 32 months beginning June, 1984, at a monthly rate of $ 1,773. Brae agreed to sell this equipment to Finalco for $ 1 at the end of that renewal period. Petitioner signed this renewal on behalf of both Brae and Finalco. D. GREENSBORO ASSOCIATES
On November 1, 1982, Greensboro Associates (Greensboro), a general partnership in which petitioner was a general partner, was formed. Each of the four partners' original capital contributions to the partnership was $ 50. During the years in issue, the partners of Greensboro Associates and their partnership interests were as follows: Partner
Partnership Interest
Petitioner
25%
Olmstead
25%
Burnett
25%
Eastham
25%
Greensboro's U.S. Partnership Returns of Income for 1982 through 1984 reflect the following items: 1982
1983 1984 Total income
($ 21,610)
$ 101,769 $ 223,510 Interest
deduction -0-
-0-
-0-
Depreciation
deduction -0-
173,859
254,993
Ordinary
income (loss) (21,610)
(72,090)
(31,483)
*573 Greensboro's partnership returns reflect the following investment interest expense passed through to its partners: Investment Interest
Petitioner's
Year
Expense
Share
1982
-0-
-0-
1983
$ 92,380 $ 23,095
1984
100,505
25,126
The "Assets" portions of Greensboro's Schedules L to its partnership returns for 1982 through 1984 reflect the following: 1982
1983 1984 Cash
$ 1,031  $ 32  $ 1,505  Other investments
(21,442)
(105,176)
(115,469)
Depreciable assets
minus depreciation
-0-
985,201 730,208 The "Liabilities and Capital" sections of the Schedules L to Greensboro's partnership returns for 1982 through 1984 reflect the following: 1982
1983
1984
Accounts payable
$ 999  -0-
-0-
Mortgages, notes,
and bonds payable in 1 year or more -0- $ 1,008,037
$ 885,784  Partners' capital
accounts (21,410)
(127,980)
(269,540)
Petitioner's Schedules K-1 for the Greensboro partnership for the years 1982 through 1984 reflect the following: Year
Capital
Ordinary Account
Gain/Loss
1982
($ 5,352) ($ 5,402) 1983
(31,995)
(18,023)
1984
(67,384)
(7,870)
The following adjustments relating to the Greensboro *574 partnership were raised in the notice of deficiency and are in dispute: Year
Net
Investment
Income/(Loss
Interest Expense
1982
$ 5,352
-0-
1983
2,674
$ 23,095
1984
9,359
25,126
1. Franklin Supply Equipment Transaction
Pursuant to a Purchase Agreement dated March 30, 1983, Gateway purchased from Finalco equipment leased to Franklin Supply Company (the Franklin Supply equipment). The stated purchase price was $ 734,260, payable by a $ 35,000 recourse Promissory Note and Security Agreement and a $ 699,260 full recourse installment promissory note. In the Purchase Agreement, Finalco covenanted as follows: 3.2 Discharge of Lien. Seller [Finalco] shall (i) fully pay and perform any and all of Seller's recourse obligations under the Lien when due and (ii) not materially modify the terms of the Lien in any way to extend or in any way alter its payments terms; provided, however, that Seller shall not be obligated to make payments on such Lien to the extent that the holder of such Lien does not have recourse against the assets of Seller for payment of such Lien. To the extent the holder of such Lien does not have recourse to the general assets of Seller, *575 if the fair market value (as determined by three (3) independent appraisers) of the Equipment securing such Lien is less than the outstanding balance of the Lien, Seller may elect to allow foreclosure against Buyer's equipment in lieu of Seller actually paying the outstanding balance of the Lien, and Seller shall reimburse Buyer for the fair market value of the equipment lost through foreclosure. [hereinafter Discharge of Lien Provision]
The Purchase Agreement also contained an Indemnification Provision (2). [24]
In connection with its purchase of the Franklin Supply equipment from Finalco, Gateway executed a "Full Recourse Installment Promissory Note", dated March 30, 1982, in the amount of $ 699,260, and an Unsecured Promissory Note, dated March 30, 1983, in the original principal amount of $ 35,000. Concurrently, by Purchase Agreement dated March 30, 1983, *576 Greensboro agreed to purchase from Gateway the Franklin Supply equipment for a total purchase price of $ 736,060, payable by a $ 36,800 recourse promissory note and a $ 699,260 limited recourse note. This Purchase Agreement contained a Discharge of Lien Provision and Indemnification Provision (2). As part of the Franklin Supply equipment purchase price, Greensboro executed a $ 699,260 Limited Recourse Promissory Note. Greensboro's maximum aggregate amount of recourse on this note was limited to $ 277,323. This note contained the following provision: 5. Payment of Lien. Payee [Gateway] does hereby agree to cause Finalco to pay all amounts due or to become due in respect of the Lien to the holder thereof, as and when required thereunder, whether constant payments, by acceleration or otherwise; provided, however, that Finalco shall not be obligated to make payments on such Lien to the extent that the holder of such Lien does not have recourse against the assets of Finalco for payment of such Lien. To the extent the holder of such Lien does not have recourse to the general assets of Finalco, if the fair market value (as determined by three (3) independent appraisers) of *577 the Equipment securing such Lien is less than the outstanding balance of the Lien, Finalco may elect to allow foreclosure against Payor's [Greensboro's] equipment in lieu of Finalco actually paying the outstanding balance of the Lien, and Finalco shall reimburse Buyer for the fair market value of the equipment lost through foreclosure.
Greensboro was obligated to make 84 monthly payments of $ 11,512.61 under the note. Pursuant to an Assignment of Note Without Security Interest, dated March 30, 1983, Gateway assigned its interest in Greensboro's Promissory Note, in the original principal amount of $ 36,800, to Finalco. By letter of the same date, Finalco consented to Gateway's assignment to Greensboro of all its benefits under the purchase agreement, including the indemnification provision, between Gateway and Finalco. Furthermore, by lease dated March 30, 1983, Greensboro leased the Franklin Supply equipment back to Finalco. This lease contained the following indemnification provision: 17. Indemnification. 17.1 Lessee [Finalco] will indemnify Lessor [Greensboro] and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or *578 expense, including, without limitation, reasonable attorneys' fees, wheresoever and howsoever arising which Lessor or its subsidiaries or shareholders, or any of its or their directors, officers, agents, employees, stockholders or partners, may incur by reason of any breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease * * *
The Purchase Agreement also provided that Finalco's underlying lessee could exercise its option to purchase equipment provided replacement equipment was transferred to Greensboro. Finalco was obligated under the lease to make monthly rental payments of $ 11,512.61. By Assignment of Lease Agreement dated March 30, 1983, Greensboro assigned its right, title, and interest in its lease agreement with Finalco to Gateway as security for its payment of its Limited Recourse Promissory Note. Concurrently, Greensboro instructed Finalco by letter to make payments due under its lease of the Franklin Supply equipment directly to Gateway to pay Greensboro's limited recourse note to Gateway. There was no cash-flow to Greensboro because the rental payments under the Finalco lease exactly equaled the principal and interest *579 due under Greensboro's installment note. Gateway was paid $ 1,800 by Finalco as intermediary fees for its role in the Franklin Supply Company transaction. 2. Greensboro Equipment Transaction
Pursuant to a Purchase Agreement, dated as of March 30, 1983, Greensboro purchased certain IBM equipment (the Greensboro Equipment) for a total purchase price of $ 423,000 from Finalco. The purchase price was payable by execution of a $ 21,100 recourse promissory note and a $ 401,900 non-recourse installment note. Greensboro executed a non-recourse Installment Note, dated March 30, 1983, in the original principal amount of $ 401,900, and a recourse Promissory Note and Security Agreement in the original principal amount of $ 21,100, to Finalco as payment for the Greensboro Equipment. Annual payments on the recourse promissory note were to commence on March 30, 1984, and the last payment was required on March 30, 1989. The Greensboro Equipment was subject to certain user leases with American Telephone and Telegraph, Cleveland Electric Illuminating Company, Consolidated Edison Company, Merrill Lynch, Pierce, Fenner & Smith, and Northwestern Bell Telephone. The Purchase Agreement between *580 Greensboro and Finalco concerning the Greensboro equipment contains Seller's Covenant and Indemnification Provisions. On March 30, 1983, each partner of Greensboro signed an Agreement of Assumption, stating that they would each assume personal liability for repayment of $ 41,275,25 of Finalco's obligation to the lender. These agreements were signed as accepted by special counsel to the lender on June 3, 1983. Simultaneously, Greensboro leased the Greensboro Equipment to Finalco for monthly payments in the following amounts: (a) $ 406.66 for 84 months in connection with the Greensboro/AT&T Lease; (b) $ 406.66 for 84 months in connection with the Greensboro/Cleveland Electric Lease; (c) $ 1,455.42 for 84 months in connection with the Greensboro/ConEd Lease; (d) $ 1,219.98 for 84 months in connection with the Greensboro/Merrill Lease; and (e) $ 3,128.16 for 84 months in connection with the Greensboro/NWBT Lease. This lease contains an Indemnification Provision. In addition, Finalco was authorized to exchange or substitute equipment under the lease. As security for its installment note concerning the Greensboro equipment transaction, Greensboro assigned its lease with Finalco to *581 Finalco. E. EAST GATE LEASING COMPANY
During the years in issue, the partners of East Gate Leasing Company (East Gate) and their partnership interests were as follows: Partner
Partnership Interest
Petitioner
30%
Olmstead
20%
Burnett
14%
Eastham
14%
Mutz
20%
Joel Davis
2%
East Gate's U.S. Partnership Returns of income for 1979 through 1984 reflect the following items: 1979 1980
1981
1982
Total income
$ 12,447 $ 19,493
$ 19,493
$ 19,493
Interest
deduction 5,396 -0- -0- -0- Depreciation
deduction 9,657 19,314
19,314
19,314
Ordinary
income (loss) (2,606)
179
179
179
1983
1984
Total income
$ 19,493
$ 19,493
Interest
deduction -0- -0- Depreciation
deduction 19,314
19,314
Ordinary
income (loss) 179
179
East Gate's partnership returns reflect the following investment interest expense passed through to its partners: Investment Interest
Petitioner's
Year
Expense Share
1979
-0- -0- 1980
$ 8,245
$ 2,473
1981
7,312
2,194
1982
6,301
1,890
1983
5,206
1,562
1984
4,020
1,206
The "Assets" portions of East Gate's Schedules L to its partnership returns for 1979 through 1984 reflect *582 the following: 1979 1980 1981
1982
Cash
-0- -0- -0- -0- Other assets
$ 1,000  $ 1,000  $ 1,000 $ 1,000 Depreciable assets
minus depreciation 125,543
106,229
86,915
67,601
1983
1984
Cash
-0-
-0- Other assets
$ 1,000 $ 1,000 Depreciable assets
minus depreciation 48,287
28,973
The "Liabilities and Capital" portions of the Schedules L to East Gate's partnership returns for 1979 through 1984 reflect the following: 1979 1980
1981
1982
Accounts payable
-0-  -0- -0- -0- Nonrecourse loans
$ 108,149
$ 96,901
$ 84,720 $ 71,528 Mortgages, notes, and bonds payable  in 1 year or more 20,000
20,000
20,000
20,000
Partners' capital
accounts (1,606)
(9,672)
(16,805)
(22,927)
1983
1984
Nonrecourse loans
57,241
41,768
Mortgages, notes,
and bonds payable in 1 year or more 20,000
20,000
Partners' capital
accounts (27,954)
(31,795)
Petitioner's Schedules K-1 for the East Gate partnership for 1979 through 1984 reflect the following: Capital
Ordinary
Year
Account
Gain/Loss
1979
($ 578)
($ 878)
1980
(2,999)
53
1981
(5,140)
53
1982
(6,978)
53
1983
(8,487)
53
1984
(9,639)
54
*583 The following adjustments relating to the East Gate partnership were raised in the notice of deficiency and are in dispute: Net
Investment
Year
Income/(Loss)
Interest Expense
1980
($ 53)
$ 2,474
1981
(53)
2,194
1982
(53)
1,890
1983
(53)
1,562
1984
[1]
[1]
1. The NWB/East Gate #1 Equipment Transaction
On December 18, 1978, Finalco purchased certain IBM 3350 disk drive equipment for $ 104,000, which was leased to Northwestern Bell Telephone Company (NWB/East Gate #1 equipment). On January 1, 1979, East Gate purchased the NWB/East Gate #1 equipment from Finalco for $ 104,000, payable by a $ 15,000 cash downpayment and execution of an $ 89,000 Installment Note. In addition, East Gate agreed to pay Finalco 30 percent of all rents after the original lease term or of sale proceeds from remarketing. East Gate executed the requisite installment note which was secured by the equipment and any lease of the equipment. East Gate's installment note was recourse to the amount of Finalco's acquisition debt which East Gate agreed to guarantee. On July 1, 1979, the NWB/East Gate #1 equipment documents were amended, decreasing: *584 The purchase price to $ 83,200; the cash downpayment to $ 12,000; and the installment note to $ 71,200. In lieu of the cash downpayment, East Gate executed a $ 12,000 promissory note dated January 1, 1979. Payments were due on this note in 1980, 1981, 1982, and 1983. A $ 12,000 promissory note dated January 1, 1980, was also executed by East Gate. This version of the promissory note provided that the principal of the note, and interest, were payable solely out of residuals in 1987. On June 1, 1982, East Gate's $ 12,000 promissory note was amended. [25] The payments due in 1981 and 1982 were no longer required, and the repayment term was extended to run from July 1, 1983, through July 1, 1987. The sole signatory of this amendment was Olmstead on behalf of East Gate. On January 1, 1979, East Gate leased the NWB/East Gate #1 equipment back to Finalco. In this lease Finalco agreed to indemnify East Gate as stated in the Indemnification Provision. In addition, Finalco was authorized to exchange and substitute equipment under the lease. The lease required 96 monthly payments of $ 1,249.83. On July 1, 1979 the monthly payments were reduced to $ 1,006.53. There was no cash-flow *585 to East Gate because the rental payments under the Finalco lease exactly equaled principal and interest payments due under East Gate's installment note. East Gate assigned its lease with Finalco to Finalco as security for its installment note. 2. The NWB/East Gate #2 Equipment Transaction
In December 1978, Finalco purchased data processing equipment for $ 83,200, which was leased to Northwestern Bell Telephone Company. A portion of this equipment was subsequently sold to East Gate (NWB/East Gate #2 equipment) on January 1, 1979, for $ 52,000, payable by an $ 8,000 cash downpayment and execution of a $ 44,000 installment note. In addition, East Gate agreed to pay Finalco 30 percent of all rents after the original lease term or sale proceeds for remarketing services. East Gate executed the requisite installment note which was secured by the equipment and any lease of the equipment. East Gate's installment note was recourse to the amount of Finalco's acquisition debt which East Gate agreed to guarantee. In lieu of the cash downpayment, East Gate executed an $ 8,000 promissory note dated January 1, 1979. This note failed to specify when payments of principal and interest *586 were due. East Gate also executed an $ 8,000 promissory note dated January 1, 1980. This version of the promissory note provided that the principal and interest were payable solely out of residuals in 1986. On June 1, 1982, East Gate's $ 8,000 promissory note was amended. The repayment term of the new note was from July 1, 1983, through July 1, 1987. [26] The sole signatory of this amendment was Olmstead on behalf of East Gate. On the same day East Gate purchased the NWB/East Gate #2 equipment from Finalco, East Gate leased the equipment back to Finalco. In this lease Finalco agreed to indemnify East Gate as stated in the Indemnification Provision. The lease also permitted Finalco to exchange and substitute equipment. The lease required 96 monthly payments of $ 1,249.83. On July 1, 1979, the monthly payments were reduced to $ 617.89. There was no cash-flow to East Gate because *587 the rental payments under the Finalco lease exactly equaled payments of principal and interest due under East Gate's installment note. East Gate assigned its lease with Finalco to Finalco as security for its installment note. By an Agreement of Assumption (dated 1980), petitioner was to assume personal liability for repayment of $ 7,300 of Finalco's obligation incurred in connection with the purchase of equipment subsequently sold to East Gate. Finalco's February 15, 1979, $ 93,303 non-recourse promissory note payable to Manufacturers Bank was secured by Javelin and East Gate equipment. F. JAVELIN LEASING COMPANY
During the years in issue, the partners of Javelin Leasing Company, and their partnership interests, were as follows: Partner
Partnership Interest
Petitioner
35%
Olmstead
15%
Burnett
15%
Eastham
15%
Mutz
18%
Joel Davis
2%
On September 1, 1984, Mutz withdrew as a partner of Javelin. Javelin's U.S. Partnership Returns of Income for 1979 through 1984 reflect the following items: 1979
1980
1981
1982
Total income
$ 61,583  $ 54,578  $ 64,629 $ 64,629 Interest
deduction 25,031 -0-  -0-  -0-  Depreciation
deduction 55,914 41,269 64,789 64,789 Ordinary
income (loss) (19,362)
(13,309)
(160)
(160)
*588 1983
1984
Total income
$ 64,629 $ 64,629 Interest
deduction -0-  -0- Depreciation
deduction 64,789 64,789 Ordinary
income (loss) (160)
(160)
Javelin's partnership returns reflect the following investment interest expense passed through to its partners: Investment Interest
Petitioner's
Year
Expense
Share
1979
-0- -0- 1980
$ 22,787
$ 7,975
1981
23,736
8,308
1982
20,342
7,120
1983
16,666
5,833
1984
12,685
4,440
The "Assets" portions of Javelin's Schedules L to its partnership returns for 1979 through 1984 reflect the following: 1979 1980 1981 1982 Cash
-0- -0- -0- -0- Other assets
$ 1,000  $ 1,000  $ 1,200  $ 1,400  Depreciable assets
minus depreciation 486,566
356,337
291,548
226,759
1983 1984 Cash
-0- -0- Other assets
$ 1,600  $ 1,800  Depreciable assets
minus depreciation 161,970
97,181
The "Liabilities and Capital" portions of the Schedules L to Javelin's partnership returns for 1979 through 1984 reflect the following: 1979
1980
1981
1982
Accounts Payable
-0- -0- -0- -0- Nonrecourse loans
$ 420,928
$ 315,177
$ 274,284
$ 229,997
Mortgages, notes,
and bonds payable in 1 year or more 85,000
70,000
70,000
70,000
Partners' capital
accounts (18,362)
(27,840)
(51,736)
(72,238)
*589 1983
1984 Nonrecourse loans
$ 182,034 $ 130,090  Mortgages, notes,
and bonds payable in 1 year or more 70,000 70,000 Partners' capital
accounts (89,064)
(101,909)
Petitioner's Schedules K-1 for the Javelin partnership for 1979 through 1984 reflect the following: Capital
Ordinary Account
Gain/Loss
1979
($ 5,001)  ($ 5,351)
1980
(8,318)
4,658 1981
(16,682)
(56)
1982
(23,858)
(56)
1983
(29,747)
(56)
1984
(34,243)
(56)
The following adjustments relating to Javelin were raised in the notice of deficiency and are in dispute: Net
Investment
Year
Income/(Loss)
Interest Expense
1980
($ 4,658)
$ 7,975
1981
56 8,308
1982
56 7,120
1983
56 5,833
1984
[1]
[1]
1. NWB/Javelin #1 Equipment Transaction
In December 1978, Finalco purchased data processing equipment for $ 104,000, which was leased to Northwestern Bell Telephone Company. Finalco sold a portion of this equipment, made up of certain IBM 3350 disk drives (the NWB/Javelin #1 equipment), to Javelin on January 1, 1979. Javelin purchased the NWB/Javelin #1 equipment from Finalco for $ 52,000, payable by an $ 8,000 *590 cash downpayment and execution of a $ 44,000 installment note. In addition, Javelin agreed to pay Finalco 30 percent of all rents after the original lease term or sale proceeds for remarketing services. Javelin executed the requisite installment note which was secured by the equipment and any lease of the equipment. Javelin's installment note was recourse to the amount of Finalco's acquisition debt which Javelin agreed to guarantee. In lieu of the cash downpayment, Javelin executed an $ 8,000 promissory note dated January 1, 1980. This note, with accumulated interest, was payable in full on January 1, 1983. On June 1, 1982, the promissory note was amended requiring installment payments of principal and interest commencing July 1, 1984, and ending July 1, 1987. [27]
On the same day it purchased the NWB/Javelin #1 equipment, Javelin leased the equipment back to Finalco. In this *591 lease Finalco agreed to indemnify Javelin as stated in the Indemnification Provision. Also pursuant to the lease, Finalco was authorized to exchange and substitute equipment. The lease required 96 monthly payments of $ 617.89. However, there was no cash-flow to Javelin because the rental payments under the Finalco lease exactly equaled the principal and interest payments due under Javelin's installment note. Javelin assigned its lease with Finalco to Finalco as security for its installment note. 2. The NWB/Javelin #2 Equipment Transaction
On January 1, 1979, Javelin purchased the NWB/Javelin #2 equipment (a 370-168 IBM central processor) [28] from Finalco for $ 130,000, payable with a $ 20,000 cash downpayment and execution of a $ 110,000 installment note. Javelin agreed to pay Finalco 30 percent of all rents after the original lease term or sale proceeds for remarketing services. Javelin executed the installment note, which was secured by the equipment and any lease of the equipment. Javelin's installment note was recourse to the amount of Finalco's acquisition debt which Javelin agreed to guarantee. *592 In lieu of the cash downpayment, Javelin executed a $ 20,000 promissory note dated January 1, 1980. This note, with accumulated interest, was payable in full on January 1, 1983. On June 1, 1982, the promissory note was amended requiring installment payments of principal and interest commencing July 1, 1984, and ending July 1, 1987. [29]
On January 1, 1979, Javelin leased the NWB/Javelin #2 equipment to Finalco. In this lease Finalco agreed to indemnify Javelin as stated in the Indemnification Provision. Also, Finalco was authorized to exchange and substitute equipment under the lease. The lease required 96 monthly payments of $ 1,544.74. However, there was no cash-flow to Javelin because the rental payments under the Finalco lease exactly equaled the principal and interest payments due under Javelin's installment note. Javelin assigned its lease with Finalco to Finalco as security *593 for its installment note. 3. The NWB/Javelin #3 Equipment Transaction
On January 24, 1979, Finalco purchased data processing equipment for $ 68,160, which was leased to Northwestern Bell Telephone Company. Finalco sold this equipment, certain IBM 3350 disk drives (NWB/Javelin #3 equipment), to Javelin by agreement dated January 1, 1979 (i.e., 3 weeks before it was purchased by Finalco). Javelin purchased the NWB/Javelin #3 equipment from Finalco for $ 68,160, payable with a $ 10,000 cash downpayment and execution of a $ 58,160 installment note. In addition, Javelin agreed to pay Finalco 30 percent of all rents after the original lease term or sale proceeds for remarketing services. Javelin executed the requisite installment note which was secured by the equipment and any lease of the equipment. Javelin's installment note was recourse to the amount of Finalco's acquisition debt which Javelin agreed to guarantee. In lieu of the cash downpayment, Javelin executed a $ 10,000 promissory note dated January 1, 1980. This note, with accumulated interest, was payable in full on January 1, 1983. On June 1, 1982, the promissory note was amended requiring installment payments of *594 principal and interest commencing July 1, 1983, and ending July 1, 1987. [30]
On the same day Javelin purchased the NWB/Javelin #3 equipment from Finalco, it leased the equipment back to Finalco. In the lease Finalco agreed to indemnify Javelin as stated in the Indemnification Provision. Also pursuant to the lease, Finalco was authorized to exchange and substitute equipment. The lease required 96 monthly payments of $ 816.74. However, there was no cash-flow to Javelin because the rental payments under the Finalco lease exactly equaled the principal and interest payments due under petitioner's installment note. Javelin assigned its lease with Finalco to Finalco as security for its installment note. 4. The NWB/Javelin #4 Equipment Transaction
On March 1, 1979, Finalco purchased data processing equipment for $ 120,160, which was leased to Northwestern Bell Telephone Company. *595 Finalco sold this equipment, certain IBM 3350 disk drive equipment (NWB/Javelin #4 equipment), to Javelin by agreement dated January 1, 1979 (i.e., 2 months before it was purchased by Finalco). Javelin purchased the NWB/Javelin #4 equipment from Finalco for $ 120,160, payable by a $ 19,000 cash downpayment and execution of an $ 101,160 installment note. In addition, Javelin agreed to pay Finalco 30 percent of all rents after the original lease term or sale proceeds for remarketing services. Javelin executed the installment note which was secured by the equipment and any lease of the equipment. Javelin's installment note was recourse to the amount of Finalco's acquisition debt which Javelin agreed to guarantee. In lieu of the cash downpayment, Javelin executed a $ 19,000 promissory note dated January 1, 1980. This note, with accumulated interest, was payable in full on January 1, 1983. On June 1, 1982, the promissory note was amended requiring installment payments of principal and interest commencing July 1, 1983, and ending July 1, 1987. [31]
*596 On the same day Javelin purchased the equipment, it leased the NWB/Javelin #4 equipment to Finalco. In this lease Finalco agreed to indemnify Javelin as stated in the Indemnification Provision. Under the lease Finalco was authorized to exchange and substitute equipment. The lease required 96 monthly payments of $ 1,420.59. However, there was no cash-flow to Javelin because the rental payments under the Finalco lease exactly equaled the principal and interest payments due under Javelin's installment note. Javelin assigned its lease with Finalco to Finalco as security for its installment note. 5. NWB/Javelin #1-4 Equipment Transactions
On February 14, 1979, Finalco leased the NWB/Javelin #1 and #3 equipment to Northwestern Bell Company. The lease required 84 monthly installments of $ 1,911 and was renewable for 1 year at a monthly rate of $ 1,720. On May 8, 1979, Finalco assigned to EDP all of its rights in the NWB/Javelin #1 through #4 leases as security for its May 8, 1979, $ 400,953 promissory note. 6. NWB/Javelin #5 Equipment Transaction
On May 14, 1979, Finalco purchased data processing equipment for $ 83,200, which was leased to Northwestern Bell Telephone *597 Company. Finalco subsequently sold one half of this equipment, certain IBM 3350 disk drive equipment (NWB/Javelin #5 equipment), to Javelin on May 18, 1979. Javelin purchased the NWB/Javelin #5 equipment from Finalco for $ 41,600. In lieu of the cash downpayment, Javelin executed a $ 6,500 promissory note dated January 1, 1980. This note, with accumulated interest, was payable in full on January 1, 1983. On June 1, 1982, the promissory note was amended requiring installment payments of principal and interest commencing July 1, 1983, and ending July 1, 1987. [32]
On the same day Javelin purchased the NWB/Javelin #5 equipment from Finalco, it leased the equipment back to Finalco. In this lease, Finalco agreed to indemnify Javelin as stated in the Indemnification Provision. Also, Finalco was authorized to exchange and substitute equipment. The lease required 96 monthly payments of $ 492.91. *598 However, there was no cash-flow to Javelin because the rental payments under the Finalco lease exactly equaled the principal and interest payments due under Javelin's installment note. Javelin assigned its lease with Finalco to Finalco as security for its installment note. Finalco assigned its lease of the NWB/Javelin #5 equipment to NSCC to secure its August 23, 1979, $ 150,210 promissory note. 7. NWB/Javelin #6 Equipment Transaction
On May 14, 1979, Finalco purchased data processing equipment for $ 83,200, which was leased to Northwestern Bell Telephone Company. Finalco sold one half of this equipment, certain IBM 3350 disk drive equipment (NWB/Javelin #6 equipment), to Javelin by agreement dated January 1, 1979 (i.e., over 4 months before it was purchased by Finalco). Javelin purchased the NWB/Javelin #6 equipment from Finalco for $ 41,600, payable by a $ 6,500 cash downpayment and execution of a $ 35,100 installment note. In addition, Javelin agreed to pay Finalco 30 percent of all rents after the original lease term or sale proceeds for remarketing services. Javelin executed the installment note which was secured by the equipment and any lease of the equipment. *599 Javelin's installment note was recourse to the amount of Finalco's acquisition debt which Javelin agreed to guarantee. In lieu of the cash downpayment, Javelin executed a $ 6,500 promissory note dated January 1, 1980. This note, with accumulated interest, was payable in full on January 1, 1983. On June 1, 1982, the promissory note was amended requiring installment payments of principal and interest commencing July 1, 1983, and ending July 1, 1987. [33]
On January 1, 1979, the same day Javelin purchased the NWB/Javelin #6 equipment from Finalco, it leased the equipment back to Finalco. In this lease Finalco agreed to indemnify Javelin as stated in the Indemnification Provision. Also, Finalco was authorized to exchange and substitute equipment. The lease required 96 monthly payments of $ 492.91. However, there was no cash-flow to Javelin because the rental payments under the Finalco *600 lease exactly equaled the principal and interest payments due under Javelin's installment note. On January 1, 1979, 4 months before it purchased the equipment, Javelin assigned its lease with Finalco to Finalco as security for its installment note. On May 10, 1979, Finalco leased the NWB/Javelin #6 equipment to Northwestern Bell Telephone company. This lease required 84 monthly payments of $ 661 and provided for a 1-year renewal term at $ 595 monthly rental payments. The record does not disclose the extent to which Javelin was liable on a recourse basis for any of Finalco's debt in any of the Javelin transactions. G. PONY PARTNERSHIP
From 1980 through April 1984, petitioner held a 25 percent partnership interest in the Pony Partnership. The Pony Partnership was not involved in computer leasing during the years in issue. It was formed to purchase two units of the Free State Raceway Association Partnership, which owned the land on which the Laurel, Maryland, racetrack is located and which controlled that racetrack. The four equal partners of Pony Partnership were petitioner, Olmstead, Mutz, and Jeff Picowuer. The following adjustments relating to the Pony partnership *601 were raised in the notice of deficiency and are in dispute: Year
Net Income
1980
$ 34,405
1981
4,753
1982
498
1983
-0-
1984
-0-
ULTIMATE FINDINGS OF FACT 1. Petitioner's individual and partnership equipment purchase and leaseback transactions lacked economic substance and business purposes, and are therefore disregarded for Federal income tax purposes. 2. Petitioners are not entitled to deduct claimed investment interest expense deductions. 3. Petitioners' investment tax credits are limited to $ 401 in 1981 and $ 105 in 1982. 4. Petitioners are liable for additions to tax for substantial understatement of income tax liability pursuant to section 6661 for 1982, 1983, and 1984. 5. Petitioners are liable for additions to tax for negligence or intentional disregard of rules and regulations pursuant to section 6653(a) for each of the years in issue. 6. Petitioners are liable for additional interest pursuant to section 6621(c) for each of the years in issue. OPINION Issues 1 and 2. Claimed Losses Related to Petitioner's Individual and Partnership Purchase and Leaseback Transactions
The first two companion issues are whether petitioners erroneously deducted *602 losses related to petitioner's individual and partnership purchase and leaseback transactions. Respondent contends that petitioners are not entitled to such losses. Petitioners argue to the contrary. As this Court stated in Larsen v. Commissioner, 89 T.C. 1229, 1251-1252 (1987), affd. on this issue sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990): Taxpayers are generally free to structure their business transactions as they please, though motivated by tax-reduction considerations. Gregory v. Helvering, 293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). However, it is well settled that a transaction entered into solely for the purpose of tax reduction, and which is without economic, commercial, or legal purpose other than the expected tax benefits, is an economic sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 196; *603 Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1243 (1981). Nevertheless, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, supra;Estate of Thomas v. Commissioner, 84 T.C. 412, 432 (1985). In the sale and leaseback context, we set forth a standard that the non-user-owner recipient of tax benefits must specifically establish that the entry into the transaction was motivated by business purpose to justify the form of the transaction, and that the transaction was supported by economic substance. Rice's Toyota World, Inc., v. Commissioner, 81 T.C. at 201-203. In Rice's Toyota World Inc., [v. Commissioner, supra,] we stated that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 196. [Fn. refs. omitted.]
See also Hines v. United States, 912 F.2d 736 (4th Cir. 1990). *604 Whether the requisite economic substance or business purpose exists is an inherently factual determination. Casebeer v. Commissioner, T.C. Memo. 1987-628, affd. 909 F.2d 1360 (9th Cir. 1990), and cases cited therein. To determine whether the requisite business purpose exists for the partnerships requires consideration of the motive and objectives of the promoters and managers of the partnerships. Peat Oil and Gas Associates v. Commissioner, 100 T.C. 271 (1993). Drawing a precise line of demarcation between valid and invalid transactions is difficult. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 197 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). In this context, it is important to emphasize that petitioners bear the burden of proving that petitioner's equipment transactions, whether undertaken individually or through partnerships, had both economic substance and a business purpose. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988), *605 affg. Brown v. Commissioner, 85 T.C. 968 (1985); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 91; Casebeer v. Commissioner, supra. In both instances, the question is as follows: "whether the transaction contained economic substance aside from the tax consequences." Hines v. United States, supra at 739. Based on our consideration of the record herein, we conclude that petitioner's individual and partnership transactions had neither economic substance nor business purpose. Thus, the transactions are to be disregarded for Federal income tax purposes. We have previously considered computer equipment transactions structured by Finalco in other cases, namely, Larsen v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, supra; Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990); Casebeer v. Commissioner, T.C. Memo. 1987-628; Shriver v. Commissioner, T.C. Memo. 1987-627, affd. 899 F.2d 724 (8th Cir. 1990); *606 Moore v. Commissioner, T.C. Memo. 1987-626, affd. sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); Sturm v. Commissioner, T.C. Memo. 1987-625, affd. sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). In the majority of these cases, we held that the Finalco-arranged transactions lacked economic substance and were shams. Petitioner's contention that his individual and partnership equipment purchase and leaseback transactions should be recognized for Federal income tax purposes rests primarily on his status as a promoter of transactions and his uncorroborated, self-serving testimony. He was the only witness. And he failed to offer any documents or supporting testimony evidencing an objective evaluation of any transaction made at or near the time of the transaction. Petitioner is a sophisticated, knowledgeable businessman. It is clear that he fully understood that, to be entitled to the deductions claimed, he must establish that his equipment transactions had economic substance and a profit objective. He repeatedly testified *607 that every transaction (with the exception of office furniture and equipment leases to Finalco) had sufficient residual value to insure a profit and that he entered into each transaction with the intent to make money. But these sweeping generalities were not based on specifics. He did not present any evidence (oral or written) [34] regarding the fair market value of the equipment at issue or its residual value. We are not required to give credence to petitioner's self-serving testimony and we do not do so. See Casebeer v. Commissioner, supra. We require more as a basis for accepting his assertions. A. Petitioner's Individual and Partnership Transactions Lacked Economic Substance
First, we must determine *608 whether the transactions had economic substance. This is accomplished by an objective analysis to ascertain if any realistic opportunity for profit existed, exclusive of the tax benefits, at the time a transaction was entered into. Larsen v. Commissioner, supra; Shriver v. Commissioner, supra. The determination of realistic opportunity for profit must be from the perspective of a prudent investor. Rice's Toyota World, Inc. v. Commissioner, supra; Shriver v. Commissioner, supra. Whether a transaction has the requisite realistic opportunity for profit requires a comparison of the investment with the anticipated return from leasing income and/or residual value. Based on this record, we hold that petitioner's equipment transactions lacked the requisite economic substance. The first factor of the economic substance equation, i.e., investment, is essentially the sum of the purchase price and the interest to be paid on funds borrowed to purchase the equipment. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 94. Petitioner *609 failed to provide sufficient evidence to establish his investment in all of his individual or partnership transactions. In instances where equipment was exchanged without valuing the exchanged equipment, it is impossible to determine the total purchase price. Furthermore, none of the partnerships had sufficient resources to purchase equipment without borrowing the funds necessary to make the purchase. Consequently, in each partnership transaction, interest paid to carry the investment, as well as the purchase price, had to be recouped before any profit was made. During the years in issue the partnerships through which petitioner invested did not claim investment interest expenses as deductions on their partnership returns but passed the deductions through to the partners. We are unable to determine the interest attributable to any specific transaction from the aggregate investment interest expense passed through to petitioner. Therefore, we cannot ascertain the total amount that had to be recouped before a profit could be made. [35]
*610 Without details concerning the interest paid to carry an investment, we cannot confirm the accuracy of petitioner's uncorroborated testimony that he "made a lot of money", or lost money, on a specific transaction or entered into it intending to make a profit. For example, petitioner testified that residual values were not considered in the transactions in which Brae purchased office furniture and equipment for Finalco's use because the initial leases of the equipment to Finalco assured the partnership, and the partners, a profit. Brae had to borrow funds to purchase this furniture and equipment because it had virtually no assets other than equipment acquired in other transactions. Although the specified lease payments exceed the purchase prices of the furniture and equipment, to determine whether a profit was assured at the outset requires consideration of the interest Brae anticipated paying, or paid, for the funds it borrowed to purchase the equipment leased to Finalco. Investment interest expenses allegedly incurred by Brae were passed through to the partners. Petitioner's share of this investment interest, totaling over $ 600,000, is in issue. No evidence was introduced *611 as to what portion of this interest expense is attributable to the equipment leased to Finalco. And no evidence was introduced corroborating petitioner's assertion that the partnership was assured a profit on these "self-dealing" transactions at the outset, and the realistic opportunity for such profits cannot be deduced from the record. Although at trial petitioner made broad statements that he intended to "make a lot of money", there is no corroboration for such statements. The relevant facts could have been presented by petitioner. They were not. As stated in Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947): The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. This is especially true where, as here, the party failing to produce the evidence has the burden of proof * * *. [Citations omitted.]
In view of petitioner's failure to introduce documentary and testimonial evidence to substantiate *612 his assertions of having a profit objective, we reject his testimony that each and every one of his transactions had economic substance. The second factor of the equation in ascertaining whether economic substance exists requires a determination of the expected income at the time petitioner entered into the transaction. The record does not contain any estimate of the level of re-leasing income that petitioner realistically should have expected when he or the partnerships purchased the equipment. Apparently, this potential source of variable income was not considered by petitioner in making his numerous investments, individually or through the partnerships. Consequently, the critical component of income is the anticipated residual value of the equipment. As to potential residual values, petitioner testified that, with the exception of the Brae partnership leases of equipment to Finalco, he assured himself in each individual and each partnership transaction that sufficient residual values could be expected to make the transaction profitable. In making his residual value determinations he relied on his own expertise and information used by Finalco in its consideration of residual *613 values. Petitioner implicitly asserts that, because he was a Finalco principal and knowledgeable about computers, he should be accepted as an expert on residual values. However, in our view he did not testify as an expert witness but rather as a lay witness. See Rule 143(f); Fed. R. Evid. 701; see also Urban Redev. Corp. v. Commissioner, 294 F.2d 328, 332 (4th Cir. 1961), affg. 34 T.C. 845 (1960). Petitioner's expertise as a Finalco principal and his computer knowledge did not qualify him to make residual value determinations. He was responsible for negotiating with financial institutions as a Finalco officer and employee. He had no experience or expertise in remarketing computer equipment, trucks, communication equipment, or office furniture and equipment. His expertise was in obtaining financing and insuring that the lease documentation was correct and acceptable to the lending institution. The residual values or potential re-leasing revenues were not a component of the analysis petitioner made in negotiating loans from financial institutions on behalf of Finalco. Petitioner did not introduce any of Finalco's information *614 that he claims to have relied on in making residual value predictions. Thus, we cannot make an assessment of its reliability as to the specific transactions in issue. We note that Finalco was in the business of selling "tax-advantaged" investments to third parties, as stated in the Prospectus. These investments generated significant deductions in the early years, thereby sheltering other income. Although some income was generated in later years, the investor reaped the benefit of deferring, or eliminating, tax liability. The presence or absence of any residual value did not affect what the third-party investor was buying; i.e., immediate, large deductions. Finalco's determination of residual values was superfluous to its income generating activity. The record does not indicate what, if any, income was earned by Finalco in selling or re-leasing equipment at the end of the initial end-user leases. The record fails to show that petitioner had a realistic potential for economic profit on any of his individual or partnership investments. "A taxpayer's mere statement of intent is given less weight than objective facts." Faulconer v. Commissioner, 748 F.2d 890, 894 (4th Cir. 1984), *615 revg. T.C. Memo. 1983-165. We have thoroughly examined the record for some evidence that petitioner in fact had reason to believe the investments would yield a profit, but we find nothing to support such an assertion. He had no objective basis for expecting a profit from the transactions. Thus, we hold that petitioner's individual and partnership transactions lacked economic substance and are "tax shams" which should be disregarded for tax purposes. See Larsen v. Commissioner, 89 T.C. 1229 (1987), affd. on this issue sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); Cherin v. Commissioner, 89 T.C. 986 (1987). B. Petitioner's Individual and Partnership Transactions Lacked a Business Purpose
In addition to economic substance, petitioner must establish that he had a business purpose for entering into these transactions individually or through the partnerships. He failed to do so. As stated by the Court of Appeals for the Eighth Circuit in Shriver v. Commissioner, 899 F.2d 724, 726 (8th Cir. 1990), which considered *616 only the "business purpose" prong of the sham analysis: The business purpose inquiry examines whether the taxpayer was induced to commit capital for reasons only relating to tax considerations or whether a non-tax motive, or legitimate profit motive, was involved. [Citation omitted.] The determination of whether the taxpayer had a legitimate business purpose in entering into the transaction involves a subjective analysis of the taxpayer's intent. Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir. 1989). * * *
Also, the Court of Appeals for the Ninth Circuit in Casebeer v. Commissioner, 909 F.2d 1360, 1363-1364 (9th Cir. 1990), succinctly described the "business purpose" test as follows:
Under the business purpose test, the court determines whether the taxpayers have shown that they had a business purpose for engaging in the transaction other than tax avoidance. Bail Bonds, 820 F.2d at 1549. "The business purpose factor often involves an examination of the subjective factors which motivated a taxpayer to make the transaction at issue." Id. * * *
As with economic *617 substance, petitioner urges us to decide that the requisite business purpose existed based entirely on his self-serving testimony. The mere assertion that a transaction was motivated by a legitimate business purpose does not establish that the transaction was not a sham. Faulconer v. Commissioner, 748 F.2d 890, 894 (4th Cir. 1984). Petitioner's attempt to bring credence to his transactions by the assertion that "he intended to make a lot of money" is simply insufficient. Petitioner further argues that his transactions had profit motives because: (1) He and Finalco's key employees took the best investments for themselves; (2) he made money overall; and (3) objective economic substance is shown by a comparison to other litigated cases. We agree with petitioner's first point because unrelated third-party investors were not offered the opportunity to claim substantial interest and depreciation deductions without investing cash. Nor were unrelated third-party investors able to unilaterally amend their notes or rewrite their agreements with Finalco. With regard to petitioner's making an overall profit, we point out that the test is whether he had a *618 realistic possibility of profit potential when he entered into a transaction. Hindsight is disregarded. Finally, petitioner contends that an analysis of comparable transactions is sufficient to establish the economic substance of his transactions. He has requested that we extrapolate from residual value determinations in prior cases regarding computer equipment leasing transactions. However, petitioner's transactions occurred in different years and/or involved different equipment. [36] Extrapolation from decided cases to petitioner's transactions is inappropriate: The mere fact that a court in one opinion makes findings of fact is not a basis for the same or another court in another proceeding to take judicial notice of those findings and to deem them to be indisputably established for purposes of the pending litigation.
Estate of Reis v. Commissioner, 87 T.C. 1016, 1028-1029 (1986); see also Petzoldt v. Commissioner, 92 T.C. 661 (1989). *619 In Hines v. United States, 912 F.2d 736 (4th Cir. 1990), the Court of Appeals for the Fourth Circuit (the Circuit to which an appeal in this case would lie) delineated three distinctive characteristics in an equipment transaction important to the Court's determination that the taxpayers were motivated solely by a desire to obtain tax benefits. These characteristics are: (1) The structure of the transaction generated large tax deductions relative to the taxpayers' cash investment; (2) lease income from the computer equipment offset the taxpayers' loan payments; i.e., a self-sustaining circle of payments was created; and, (3) without tax benefits, profits from the investment, if any, would come only from re-leasing and residual income. Id. at 737-738. The first characteristic mentioned by the Court of Appeals in Hines v. United States, supra, whether the structure of the transaction generated large tax deductions relative to the taxpayers' cash investment, is exceedingly stark in each of petitioner's individual and partnership transactions. For little or no cash investment, he or the *620 partnership allegedly "paid" millions of dollars for equipment which generated enormous deductions for petitioner. Generally, in bona fide equipment sale and leaseback transactions, an investor's "cash" or "equity" investment includes cash paid out-of-pocket and recourse equity notes executed when the transaction is entered into and payable within a few years. Respondent contends that the "equity" notes executed by petitioner in his individual transactions or through the partnerships should not be viewed as amounts invested. [37] We agree. Petitioner and the partnerships executed such notes and, uniformly, failed to make the payments as required by such notes. In numerous instances, having defaulted on payments, petitioner or the partnerships unilaterally amended the payment schedules. Even in these instances, there was no adherence to the amended payment schedules. Essentially, if and when re-leasing or equipment sale income was generated on any of petitioner's or the partnerships' transactions, such income was applied to pay outstanding equity notes. Petitioner testified that all equity note payments were made in a "commercially reasonable manner." We disagree with petitioner's *621 view of such payments. The second characteristic mentioned in Hines, a self-sustaining circle of payments, was created both in petitioner's individual and partnership transactions. In some instances little or no money actually changed hands between the parties. The third characteristic mentioned in Hines (i.e., that without tax benefits, profits, if any, would come from re-leasing and residual income) is, with the exception of Brae's lease of office furniture *622 and equipment to Finalco for its use, present both in petitioner's individual and partnership transactions. For example, the willingness of the AUC partnership to "resell" equipment to Finalco while retaining tax deductions indicates profit was not the objective in entering these transactions. Similarly, a partnership's "exchange" of equipment, after tax benefits had been absorbed, attests to the fact that tax benefits rather than profits from re-leasing or resale of the equipment was the motive for petitioner's transaction. In sum, petitioner did not have a business purpose when he or the partnerships entered into the transactions in issue. Because these investments also lacked economic substance, the transactions were tax shams which should be disregarded for Federal income tax purposes. [38]
*623 Having concluded that petitioners erroneously deducted losses related to petitioner's individual and partnership purchase and leaseback transactions, it is unnecessary for us to discuss the applicability of the "at risk" provisions of section 465. See Pacific Sound Prod. Ltd. Partnership v. Commissioner, T.C. Memo. 1993-253; Goldwasser v. Commissioner, T.C. Memo. 1988-523; cf. Larsen v. Commissioner, 89 T.C. 1229 (1987); Lansburgh v. Commissioner, T.C. Memo. 1987-491. Issue 3. Investment Interest Expenses
The third issue is whether petitioners erroneously deducted investment interest expenses related to promissory notes executed in connection with both petitioner's individual and partnership purchase and leaseback transactions. Respondent disallowed in the notice of deficiency the investment interest expense deductions claimed by petitioners because they did not establish that the transactions generating the debt and interest obligations had economic substance or that any interest within the meaning of section 163 was paid or properly accruable. *624 Petitioners argue that they did not erroneously deduct the investment interest expenses related to the promissory notes. Deductions are a matter of legislative grace, and taxpayers must prove their entitlement to them. Deputy v. Du Pont, 308 U.S. 488 (1940); New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435 (1934). We hold on this record that petitioners have failed to establish that they are entitled to the investment interest deductions claimed. Therefore, we sustain respondent's determination on this issue. Issue 4. Investment Tax Credits
The fourth issue is whether petitioners' investment tax credits for 1981 and 1982 are properly limited to $ 401 and $ 105, respectively. Investment tax credits are disallowed to a noncorporate lessor that is not the manufacturer or producer of the investment property unless the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property and, for the first 12 months of the lease, the amount of certain section 162 deductions exceeds 15 percent of the rental income produced by the property. Sec. 46(e)(3)(B). Petitioners *625 have the burden of proving their entitlement to claimed investment tax credits. See Rule 142(a); Greenbaum v. Commissioner, T.C. Memo. 1987-222. Petitioners contend that the equipment at issue has a 3-year useful life and that the lease terms did not exceed 50 percent of the equipments' useful life. However, respondent disputes these arguments. Respondent has not conceded either of these predicates to petitioners' entitlement to the claimed investment tax credits. There is no evidence in the record to substantiate petitioners' assertions. Hence, petitioners have failed to carry their burden of proof. Consequently, we sustain respondent's determinations on this issue. Issue 5. Additions to Tax Pursuant to Sections 6653(a) and 6653(a)(1) and (2)
The fifth issue is whether petitioners are liable for the additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a) for 1980, and section 6653(a)(1) and (2) for 1981, 1982, 1983, and 1984. Respondent argues that petitioners are liable for such additions to tax. Petitioners argue to the contrary. Section 6653(a) for 1980 and section 6653(a)(1) for *626 1981 through 1984 (the years in issue) impose an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) for 1981 through 1984 imposes an additional amount, but only with respect to the portion of the underpayment attributable to the negligence. Negligence is the lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed to be correct and petitioners have the burden of proving that it is erroneous. See Rule 142(a). Petitioner contends that he was not negligent because he reviewed the economic substance of every transaction and that he relied upon sound advice regarding the at-risk rules. To excuse negligence because of reliance upon professional advice, a taxpayer must have provided the adviser with complete and correct information. Pessin v. Commissioner, 59 T.C. 473, 489 (1972). Here, petitioner has not shown that he provided complete information to his own, or Finalco's, lawyers concerning *627 the specific terms of his transactions, his note amendments and unilateral assumption agreements, or his disregard of transaction provisions, such as payment schedules of promissory notes. Reliance on other Finalco principals engaged in comparable or the same transactions does not excuse petitioner's negligence. Based on the entire record before us, we hold that petitioners have failed to show that any part of their determined deficiencies was not due to negligence or intentional disregard of the rules. Thus, we sustain respondent's determinations with respect to the section 6653(a) and section 6653(a)(1) and (2) additions to tax. See, e.g., Offermann v. Commissioner, T.C. Memo. 1988-236. Issue 6. Additions to Tax Pursuant to Section 6661
The sixth issue for decision is whether petitioners are liable for the additions to tax for substantial understatement of income tax liability under section 6661 for 1982, 1983 and 1984. Respondent contends that petitioners are liable for such additions. Petitioners disagree. Section 6661 provides that, if there is a substantial understatement of income tax for any taxable year, there shall be added *628 to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. There is a substantial understatement if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000. Sec. 6661(b)(1)(A). Petitioners have the burden of proof. Rule 142(a). In Offermann v. Commissioner, supra, the Court, citing section 6661(b)(2)(C)(ii), held that the installment note, on which the taxpayer was not at risk, "falls within the definition of 'tax shelter' because it represents an arrangement having as its principal purpose the avoidance or evasion of Federal income tax." Petitioner's notes also fall within the Offermann definition of a tax shelter. Moreover, petitioner's individual and partnership transactions are "tax shams" which we view as tax shelters under section 6661(b)(2)(C)(ii) because they were arranged with the principal purpose of avoiding or evading Federal income tax. Petitioners have failed to show, as required by that section, that substantial authority exists for their treatment of any of the items giving rise to *629 the understatements of their tax, or that they reasonably believed that their treatment of such items was more likely than not to be correct. Consequently, petitioners are liable for the additions to tax pursuant to section 6661. Issue 7. Additional Interest Pursuant to Section 6621(c)
The final issue is whether petitioners are liable for additional interest under section 6621(c) for the years in issue. Section 6621(c), formerly section 6621(d), provides for interest at the rate of 120 percent of the normal interest rate under section 6601 with respect to any substantial underpayment over $ 1,000 which is attributable to tax-motivated transactions. Tax-motivated transactions are defined in section 6621(c)(3) to include "any sham or fraudulent transaction." Transactions devoid of profit motive and economic substance are sham transactions. Sec. 6621(c)(3)(A)(v); Cherin v. Commissioner, 89 T.C. 986, 1000 (1987); Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), *630 affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Tax-motivated transactions are also defined to include any loss disallowed by reason of section 465. Sec. 6621(c)(3)(A)(ii). The applicability of increased interest as provided in section 6621(c) has been repeatedly recognized by this Court in comparable cases. Larsen v. Commissioner, 89 T.C. 1229, 1251-1252 (1987), affd. on this issue sub nom Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir. 1990); Cohen v. Commissioner, T.C. Memo. 1988-525, affd. sub nom. Young v. Commissioner, 926 F.2d 1083 (11th Cir. 1991); Young v. Commissioner, T.C. Memo. 1988-440, affd. 926 F.2d 1083 (11th Cir. 1991); Casebeer v. Commissioner, T.C. Memo. 1987-628, affd. *631 909 F.2d 1360 (9th Cir. 1990); Shriver v. Commissioner, T.C. Memo. 1987-627, affd. 899 F.2d 724 (8th Cir. 1990); Moore v. Commissioner, T.C. Memo. 1987-626, affd. sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990). Because we have disallowed the claimed losses relating to petitioner's equipment transactions based on findings that these transactions are "tax shams" devoid of economic substance, we hold that petitioners are liable for the additional interest authorized by section 6621(c). To reflect the conclusions reached herein, Decision will be entered under Rule 155. Footnotes
1. Prior to and at trial, petitioners' counsel were James P. Parker, John J. Yurow, and Helen L. Gemmill. Subsequently, petitioners employed new counsel as listed above.↩
1. For 1980, the additions to tax for negligence or intentional disregard of rules and regulations are codified under sec. 6653(a).↩
3. 120 percent of the interest due on the entire deficiency.↩
2. 50 percent of the interest due on the entire deficiency.↩
2. Petitioner Nancy M. Prager was not involved in any of the transactions at issue. Unless otherwise specified, the term "petitioner" shall refer only to Jon J. Prager.↩
3. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Finalco Group, Inc., was formerly known as Financial Analytics Corp.↩
5. Our use of the words "lease", "purchase", and other similar terms does not imply that we consider the underlying transaction to be in fact construed as a "lease" or "purchase" for Federal income tax purposes. Our task is to probe beyond the labels given by the parties to determine whether an actual economic investment existed. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 210 (1983), affd. on this ground 752 F.2d 89↩ (4th Cir. 1985).
6. Petitioner was concerned about exposure to personal recourse liability. In fact, the Prospectus states that FG sold the equipment for "promissory notes which, prior to July 1, 1982, with one exception, were nonrecourse and payable solely out of the residual value of the specific equipment purchased by the individual officer or director * * *. Notes executed after July 1, 1982, were full recourse."↩
7. Generally, computer equipment can be divided into two broad classifications, peripheral equipment and mainframe or central processing equipment. Peripheral equipment refers to the equipment in a computer system which feeds information into and out of the central processor. The central processor is the "core" or "brain" of the computer which performs data processing functions.↩
8. Finalco had a "residual analysis department" or "product development department". This department was created to obtain projected residual values of equipment. However, petitioner did not introduce any evidence with respect to the residual values of the equipment involved herein, other than his uncorroborated testimony. He did not call any witnesses other than himself. Finalco also had a "remarketing department" which attempted to maximize, on a buy-sell basis, the equipment Finalco wished to sell or release.↩
9. Some of these acquisitions involved equipment that had already been leased by Comdisco, another leasing company. See supra↩ p. 12.
1. Petitioner executed this $ 50 promissory note on Nov. 11, 1980 (payable with accrued interest). This note was paid by a $ 53.30 check dated Aug. 21, 1980.↩
2. The provision in these notes explicitly making them non-recourse is stricken and typed in below is the notation "This Promissory Note is recourse to the Maker."↩
3. In lieu of an installment note in the Martin Marietta transaction, petitioner's purchase price was comprised of a $ 27,919 equity note and a $ 1,098,325 assumption, on a partial recourse basis, of Finalco's indebtedness to Buffalo Savings Bank.↩
10. Thus, there was no cash flow to petitioner under the leases because the rental payments equaled the principal and interest payments due under petitioner's installment notes.↩
1. TEFRA partnership level procedures apply.↩
11. The record is unclear as to the amount of the outstanding balance.↩
1. The record is unclear whether AUC took any depreciation deduction with regard to the Keebler equipment.↩
1. By letter dated Mar. 28, 1979, Finalco granted Regency an option to purchase equipment Finalco sold to AUC three days later. The agreed option purchase price was 15 percent of the Original Acquisition Financing of the Equipment and could be exercised after 72 monthly lease payments had been made. Fifteen percent of Finalco's $ 469,609.07 Acquisition Financing was $ 74,491.36. Regency's option purchase price was 10 percent of AUC's $ 728,102 purchase price for the same equipment.↩
2. The purchase price charged by AUC on March 31, 1979, for the Wallace equipment exceeded by $ 16,055.00 ($ 64,220 - $ 48,165), i.e., 33 percent, the amount Finalco had paid for the equipment on the same day.↩
12. Thus, there was no cash flow to AUC under the lease agreement because the rental payments exactly equaled the principal and interest payments due under the AUC installment note.↩
13. At the time of Montgomery-35's purchase of this equipment, it was on lease to Questor Corporation.↩
14. At the time Montgomery-35 purchased this equipment, it was on lease to Northwest Bell Telephone Co.↩
15. Montgomery-35 sold the Northwestern Bell #4 equipment for one unit of electronic data processing equipment located at Amoco Production Co.↩
1. At the time Montgomery-35 purchased the Borg Warner #1 and #2 equipment, they were on lease to Borg-Warner Corp.↩
2. At the time of Montgomery-35's purchase of the Allegheny equipment, it was on lease to Allegheny Ludlum Industries, Inc.↩
3. At the time of Montgomery-35's purchase of the Ford Motor co. equipment, it was on lease to Ford Motor Co.↩
1. At the time Montgomery-35 purchased the Standard Oil equipment, it was on lease to Standard Oil Co.↩
2. At the time of Montgomery-35's purchase of the NW Bell #6 and #7 equipment, they were on lease to Northwestern Bell Telephone Co.↩
1. At the time Montgomery-35 purchased the Ford Motor Co. #2 and #3 equipment, it was on lease to Ford Motor Co.↩
2. At the time Montgomery-35 purchased the Sprague equipment, it was on lease to Sprague Electric Co.↩
3. At the time Montgomery-35 purchased the Flexi-Van Corp. equipment, it was on lease to Flexi-Van Financial Service Corp.↩
4. At the time Montgomery-35 purchased the Reliance Electric equipment, it was on lease to Reliance Electric Co.↩
1. The equipment that Montgomery-35 transferred to Finalco as part of the purchase price of the Ford Motor Co. #2 and #3 equipment consisted of a Honeywell central processor and related equipment the partnership had purchased from Finalco in 1975 for $ 394,868.19. No value was placed on this "exchanged" equipment in the Ford Motor Co. Purchase Agreements nor was any evidence introduced reflecting whether a gain or loss was realized by Montgomery-35 on this "exchange". The exchange agreement provided that the Apr. 2, 1975, non-negotiable promissory note in the principal amount of $ 4,500 was not affected by the exchange and remained due and payable in July 1979.↩
2. The equipment that Montgomery-35 transferred to Finalco as part of the purchase price of the Sprague Equipment consisted of: five units of Honeywell processing equipment it had purchased from Finalco for $ 16,875 in 1972, and, 29 units of Honeywell processing equipment it had purchased from Finalco for $ 169,000 in 1975. No value was placed on this "exchanged" equipment in the Sprague Purchase Agreement nor was any evidence introduced reflecting whether a gain or loss was realized by Montgomery-35 on this "exchange".↩
16. The $ 11,700 Promissory Note was "recourse" only to the extent of Brae's property, securities, or money in Finalco's possession.↩
1. The promissory note principal and all accrued interest executed by Brae in connection with its purchase of the Leigh Products, Inc. equipment was payable in 1988 entirely out of residuals. That note was amended on December 21, 1981, requiring payments of principal and interest from January 1, 1983, through January 1, 1987. The sole signatory of the amendment was Eastham as a general partner of Brae.↩
17. On the same day Finalco purchased the Leigh Products, Inc. equipment and resold it to Brae, Finalco and Brae entered into an Amendment substituting equipment sold to Brae under the Leigh Products, Inc. Purchase Agreement.↩
18. Brae's net equity was defined as its equity note less any investment tax credit claimed with respect to the equipment.↩
19. The record contains no explanation of how petitioner could assume on Aug. 1, 1980, a portion of a Finalco debt which did not exist until Nov. 18, 1980.↩
20. The record contains no explanation of how petitioner could assume on Aug. 1, 1980, a portion of a Finalco debt which did not exist until Nov. 18, 1980.↩
21. On April 1, 1981, Brae assigned its interest in the International Harvester #3 equipment and the lease rentals between Finalco and International to Finalco as security for its $ 26,305.54 nonrecourse promissory note.↩
1. Finalco's $ 821,102 non-recourse promissory note to Charter provided that it was payable solely out of the proceeds received by Charter during the remarketing term.↩
1. On June 15, 1982, Brae executed a $ 42,000 Promissory Note and Security Agreement payable to TPA in connection with the Credit Bureau equipment. The first payment was due on this note on July 1, 1985, and was payable to Finalco. By letter dated June 15, 1982, Finalco agreed to accept the Brae note in satisfaction of TPA's notes and to refund to TPA $ 2,100 "which is the excess of the principal amount of the Note over the principal amount of the Recourse Note referred to in the Purchase Agreement."↩
22. At the time of Blackwood's purchase, the Credit Bureau equipment was subject to a lease, dated Apr. 14, 1981, between Comdisco and Credit Bureau Data Centers, Inc.↩
23. The record does not disclose why the note is $ 100 less than the amount specified in the Purchase Agreement.↩
1. Finalco Lease #5 contains Indemnification Provision (4).↩
24. In a letter agreement dated Mar. 30, 1983, Finalco reiterated its agreement to indemnify Gateway in connection with the Franklin Supply equipment.↩
1. Subject to TEFRA proceeding.↩
25. The amended promissory note was "recourse" only to the extent of East Gate's property, securities, or money in Finalco's possession.↩
26. The amended promissory note was "recourse" only to the extent of East Gate's property, securities, or money in Finalco's possession.↩
1. Subject to TEFRA proceeding.↩
27. The amended promissory note was "recourse" only to the extent of Javelin's property, securities, or money in Finalco's possession.↩
28. At the time of Javelin's purchase of the Javelin #2 equipment it was on lease from Finalco to Northwestern Bell Telephone Co.↩
29. The amended promissory note was "recourse" only to the extent of Javelin's property, securities, or money in Finalco's possession.↩
30. The amended promissory note was "recourse" only to the extent of Javelin's property, securities, or money in Finalco's possession.↩
31. The amended note was "recourse" only to the extent of Javelin's property, securities, or money in Finalco's possession.↩
32. The amended note was "recourse" only to the extent of Javelin's property, securities or money in Finalco's possession.↩
33. The amended promissory note was "recourse" only to the extent of Javelin's property, securities, or money in Finalco's possession.↩
34. Petitioner testified that Finalco's residual analysis department "obtained expert information * * * on what the projected residual values of the equipment would be." He had the opportunity at trial to present such "expert information", such as the "special residual value studies", but failed to do so.↩
35. Similarly, the record provides no details concerning the 1979 interest expense attributable to any of the five individual transactions entered into by petitioner in that year.↩
36. With respect to petitioner's Irving Trust transaction, he asks us to follow Larsen v. Commissioner, 89 T.C. 1229, 1263-1269 (1987), affd. in part and revd. in part sub nom. Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990), which held that the Irving 1 and 2 transactions in that case would be recognized for Federal income tax purposes. By contrast, the facts here are different from those in Larsen. While the Irving Trust equipment purchased by petitioner was subject to the same Irving Trust Company User Lease as the equipment in Larsen, and petitioner's Irving Trust transaction was structured identically to the Larsen Irving Trust 1 and 2 transactions, the similarities end there. First, the type of equipment in petitioner's transaction was different than that in Larsen. Second, and most importantly, the Court in Larsen had sufficient evidence to determine the residual value of the equipment (based on expert opinion evidence). This highly critical factor is missing in this case. Based on the residual value determinations, the Court in Larsen↩ was able to conclude that economic substance existed. Unfortunately for petitioner, he did not provide us with such evidence.
37. We note that the primary underlying financing for Finalco's acquisition of equipment sold to petitioner, or to the partnerships through which he invested, was nonrecourse. Some of Finalco's acquisition notes explicitly provided that they were nonrecourse to Finalco, its incorporators, shareholders, officers or directors. Petitioner was an incorporator, shareholder, officer and director of Finalco. Further, to create the appearance of being at risk he executed numerous Assumption Agreements concerning his individual and partnership transactions.↩
38. Focusing on the substance of the transactions, we can only state that petitioner "did not purchase or lease a computer, but rather, paid a fee . . . in exchange for tax benefits." Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 95 (4th Cir. 1985), affg. on this issue 81 T.C. 184↩ (1983).